# MALLOY *v.* HOGAN, SHERIFF.

No. 110.   Argued March 5, 1964.—Decided June 15, 1964.

*Harold Strauch* argued the cause and filed a brief for petitioner.

*John D. LaBelle,* State's Attorney for Connecticut, argued the cause for respondent. With him on the brief were *George D. Stoughton* and *Harry W. Hultgren, Jr.,* Assistant State's Attorneys.

*Melvin L. Wulf* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *Stanley Mosk,* Attorney General of California, *William É. James,* Assistant Attorney General, and *Gordon Ringer,* Deputy Attorney General, for the State of California; and by *Frank S. Hogan, Edward S. Silver, H. Richard Uviller, Michael R. Juviler, Aaron E. Koota* and *Irving P. Seidman* for the National District Attorneys' Association.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In this case we are asked to reconsider prior decisions holding that the privilege against self-incrimination is not safeguarded against state action by the Fourteenth Amendment. *Twining* v. *New Jersey,* 211 U. S. 78; *Adamson* v. *California,* 332 U. S. 46.[1]

---

[1] In both cases the question was whether comment upon the failure of an accused to take the stand in his own defense in a state prosecution violated the privilege. It was assumed, but not decided, in both cases that such comment in a federal prosecution for a federal offense would infringe the provision of the Fifth Amendment that "no per-

The petitioner was arrested during a gambling raid in 1959 by Hartford, Connecticut, police. He pleaded guilty to the crime of pool selling, a misdemeanor, and was sentenced to one year in jail and fined $500. The sentence was ordered to be suspended after 90 days, at which time he was to be placed on probation for two years. About 16 months after his guilty plea, petitioner was ordered to testify before a referee appointed by the Superior Court of Hartford County to conduct an inquiry into alleged gambling and other criminal activities in the county. The petitioner was asked a number of questions related to events surrounding his arrest and conviction. He refused to answer any question "on the grounds it may tend to incriminate me." The Superior Court adjudged him in contempt, and committed him to prison until he was willing to answer the questions. Petitioner's application for a writ of habeas corpus was denied by the Superior Court, and the Connecticut Supreme Court of Errors affirmed. 150 Conn. 220, 187 A. 2d 744. The latter court held that the Fifth Amendment's privilege against self-incrimination was not available to a witness in a state proceeding, that the Fourteenth Amendment extended no privilege to him, and that the petitioner had not properly invoked the privilege available under the Connecticut Constitution. We granted certiorari. 373 U. S. 948. We reverse. We hold that the Fourteenth Amendment guaranteed the petitioner the protection of the Fifth Amendment's privilege against self-incrimination, and that under the applicable federal standard, the Connecticut Supreme Court of Errors erred in holding that the privilege was not properly invoked.

son . . . shall be compelled in any criminal case to be a witness against himself." For other statements by the Court that the Fourteenth Amendment does not apply the federal privilege in state proceedings, see *Cohen* v. *Hurley,* 366 U. S. 117, 127–129; *Snyder* v. *Massachusetts,* 291 U. S. 97, 105.

4

The extent to which the Fourteenth Amendment prevents state invasion of rights enumerated in the first eight Amendments has been considered in numerous cases in this Court since the Amendment's adoption in 1868. Although many Justices have deemed the Amendment to incorporate all eight of the Amendments,[2] the view which has thus far prevailed dates from the decision in 1897 in *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, which held that the Due Process Clause requires the States to pay just compensation for private property taken for public use.[3] It was on the authority of that decision that the Court said in 1908 in *Twining* v. *New Jersey, supra,* that "it is possible that some of the personal rights safeguarded by the first eight Amendments

---

[2] Ten Justices have supported this view. See *Gideon* v. *Wainwright,* 372 U. S. 335, 346 (opinion of MR. JUSTICE DOUGLAS). The Court expressed itself as unpersuaded to this view in *In re Kemmler,* 136 U. S. 436, 448–449; *McElvaine* v. *Brush,* 142 U. S. 155, 158–159; *Maxwell* v. *Dow,* 176 U. S. 581, 597–598; *Twining* v. *New Jersey, supra,* p. 96. See *Spies* v. *Illinois,* 123 U. S. 131. Decisions that particular guarantees were not safeguarded against state action by the Privileges and Immunities Clause or other provision of the Fourteenth Amendment are: *United States* v. *Cruikshank,* 92 U. S. 542, 551; *Prudential Ins. Co.* v. *Cheek,* 259 U. S. 530, 543 (First Amendment); *Presser* v. *Illinois,* 116 U. S. 252, 265 (Second Amendment); *Weeks* v. *United States,* 232 U. S. 383, 398 (Fourth Amendment); *Hurtado* v. *California,* 110 U. S. 516, 538 (Fifth Amendment requirement of grand jury indictments); *Palko* v. *Connecticut,* 302 U. S. 319, 328 (Fifth Amendment double jeopardy); *Maxwell* v. *Dow, supra,* at 595 (Sixth Amendment jury trial); *Walker* v. *Sauvinet,* 92 U. S. 90, 92 (Seventh Amendment jury trial); *In re Kemmler, supra; McElvaine* v. *Brush, supra; O'Neil* v. *Vermont,* 144 U. S. 323, 332 (Eighth Amendment prohibition against cruel and unusual punishment).

[3] In *Barron* v. *Baltimore,* 7 Pet. 243, decided before the adoption of the Fourteenth Amendment, Chief Justice Marshall, speaking for the Court, held that this right was not secured against state action by the Fifth Amendment's provision: "Nor shall private property be taken for public use, without just compensation."

against National action may also be safeguarded against state action, because a denial of them would be a denial of due process of law." 211 U. S., at 99.

The Court has not hesitated to re-examine past decisions according the Fourteenth Amendment a less central role in the preservation of basic liberties than that which was contemplated by its Framers when they added the Amendment to our constitutional scheme. Thus, although the Court as late as 1922 said that "neither the Fourteenth Amendment nor any other provision of the Constitution of the United States imposes upon the States any restrictions about 'freedom of speech' . . . ," *Prudential Ins. Co.* v. *Cheek,* 259 U. S. 530, 543, three years later *Gitlow* v. *New York,* 268 U. S. 652, initiated a series of decisions which today hold immune from state invasion every First Amendment protection for the cherished rights of mind and spirit—the freedoms of speech, press, religion, assembly, association, and petition for redress of grievances.[4]

Similarly, *Palko* v. *Connecticut,* 302 U. S. 319, decided in 1937, suggested that the rights secured by the Fourth Amendment were not protected against state action, citing, 302 U. S., at 324, the statement of the Court in 1914 in *Weeks* v. *United States,* 232 U. S. 383, 398, that "the Fourth Amendment is not directed to individual misconduct of [state] officials." In 1961, however, the

---

[4] *E. g., Gitlow* v. *New York,* 268 U. S. 652, 666 (speech and press); *Lovell* v. *City of Griffin,* 303 U. S. 444, 450 (speech and press); *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (speech and press); *Staub* v. *City of Baxley,* 355 U. S. 313, 321 (speech); *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244 (press); *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (religion); *De Jonge* v. *Oregon,* 299 U. S. 353, 364 (assembly); *Shelton* v. *Tucker,* 364 U. S. 479, 486 (association); *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, 296 (association); *NAACP* v. *Button,* 371 U. S. 415 (association and speech); *Brotherhood of Railroad Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U. S. 1 (association).

Court held that in the light of later decisions,[5] it was taken as settled that ". . . the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth . . . ." *Mapp* v. *Ohio,* 367 U. S. 643, 655. Again, although the Court held in 1942 that in a state prosecution for a noncapital offense, "appointment of counsel is not a fundamental right," *Betts* v. *Brady,* 316 U. S. 455, 471; cf. *Powell* v. *Alabama,* 287 U. S. 45, only last Term this decision was re-examined and it was held that provision of counsel in all criminal cases was "a fundamental right, essential to a fair trial," and thus was made obligatory on the States by the Fourteenth Amendment. *Gideon* v. *Wainwright,* 372 U. S. 335, 343–344.[6]

We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States.   Decisions of the Court since *Twining* and *Adamson* have departed from the contrary view expressed in those cases.   We discuss first the decisions which forbid the use of coerced confessions in state criminal prosecutions.

*Brown* v. *Mississippi,* 297 U. S. 278, was the first case in which the Court held that the Due Process Clause prohibited the States from using the accused's coerced confessions against him.   The Court in *Brown* felt impelled, in light of *Twining,* to say that its conclusion did not involve the privilege against self-incrimination.   "Compulsion by torture to extort a confession is a different matter."   297 U. S., at 285.   But this distinction was soon

---

[5] See *Wolf* v. *Colorado,* 338 U. S. 25, 27–28; *Elkins* v. *United States,* 364 U. S. 206, 213.

[6] See also *Robinson* v. *California,* 370 U. S. 660, 666, which, despite *In re Kemmler, supra; McElvaine* v. *Brush, supra; O'Neil* v. *Vermont, supra,* made applicable to the States the Eighth Amendment's ban on cruel and unusual punishments.

abandoned, and today the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in *Bram* v. *United States,* 168 U. S. 532, the Court held that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Id.,* at 542. Under this test, the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was "free and voluntary: that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . ." *Id.,* at 542–543; see also *Hardy* v. *United States,* 186 U. S. 224, 229; *Wan* v. *United States,* 266 U. S. 1, 14; *Smith* v. *United States,* 348 U. S. 147, 150. In other words the person must not have been compelled to incriminate himself. We have held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed. *Haynes* v. *Washington,* 373 U. S. 503.

The marked shift to the federal standard in state cases began with *Lisenba* v. *California,* 314 U. S. 219, where the Court spoke of the accused's "free choice to admit, to deny, or to refuse to answer." *Id.,* at 241. See *Ashcraft* v. *Tennessee,* 322 U. S. 143; *Malinski* v. *New York,* 324 U. S. 401; *Spano* v. *New York,* 360 U. S. 315; *Lynumn* v. *Illinois,* 372 U. S. 528; *Haynes* v. *Washington,* 373 U. S. 503. The shift reflects recognition that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. *Rogers* v. *Richmond,* 365 U. S. 534,

541. Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth. Since the Fourteenth Amendment prohibits the States from inducing a person to confess through "sympathy falsely aroused," *Spano* v. *New York, supra,* at 323, or other like inducement far short of "compulsion by torture," *Haynes* v. *Washington, supra,* it follows *a fortiori* that it also forbids the States to resort to imprisonment, as here, to compel him to answer questions that might incriminate him. The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty, as held in *Twining,* for such silence.

This conclusion is fortified by our recent decision in *Mapp* v. *Ohio,* 367 U. S. 643, overruling *Wolf* v. *Colorado,* 338 U. S. 25, which had held "that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure," 338 U. S., at 33. *Mapp* held that the Fifth Amendment privilege against self-incrimination implemented the Fourth Amendment in such cases, and that the two guarantees of personal security conjoined in the Fourteenth Amendment to make the exclusionary rule obligatory upon the States. We relied upon the great case of *Boyd* v. *United States,* 116 U. S. 616, decided in 1886, which, considering the Fourth and Fifth Amendments as running "almost into each other," *id.,* at 630, held that "Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within

the condemnation of [those Amendments] . . . ." At 630. We said in *Mapp:*

> "We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation' in their perpetuation of 'principles of humanity and civil liberty [secured] . . . only after years of struggle,' *Bram* v. *United States,* 168 U. S. 532, 543–544 . . . . The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence." 367 U. S., at 656–657.

In thus returning to the *Boyd* view that the privilege is one of the "principles of a free government," 116 U. S., at 632,[7] *Mapp* necessarily repudiated the *Twining* concept of the privilege as a mere rule of evidence "best defended not as an unchangeable principle of universal justice but as a law proved by experience to be expedient." 211 U. S., at 113.

The respondent Sheriff concedes in his brief that under our decisions, particularly those involving coerced

---

[7] *Boyd* had said of the privilege, ". . . any compulsory discovery by extorting the party's oath . . . to convict him of crime . . . is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." 116 U. S., at 631–632.

Dean Griswold has said: "I believe the Fifth Amendment is, and has been through this period of crisis, an expression of the moral striving of the community. It has been a reflection of our common conscience, a symbol of the America which stirs our hearts." The Fifth Amendment Today 73 (1955).

confessions, "the accusatorial system has become a fundamental part of the fabric of our society and, hence, is enforceable against the States." [8]  The State urges, however, that the availability of the federal privilege to a witness in a state inquiry is to be determined according to a less stringent standard than is applicable in a federal proceeding.  We disagree.  We have held that the guarantees of the First Amendment, *Gitlow* v. *New York, supra; Cantwell* v. *Connecticut,* 310 U. S. 296; *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, the prohibition of unreasonable searches and seizures of the Fourth Amendment, *Ker* v. *California,* 374 U. S. 23, and the right to counsel guaranteed by the Sixth Amendment, *Gideon* v. *Wainwright, supra,* are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.  In the coerced confession cases, involving the policies of the privilege itself, there has been no suggestion that a confession might be considered coerced if used in a federal but not a state tribunal.  The Court thus has rejected the notion that the Fourteenth Amendment applies to the States only a "watered-down, subjective version of the indi-

---

[8] The brief states further:

"Underlying the decisions excluding coerced confessions is the implicit assumption that an accused is privileged against incriminating himself, either in the jail house, the grand jury room, or on the witness stand in a public trial. . . .

". . . It is fundamentally inconsistent to suggest, as the Court's opinions now suggest, that the State is entirely free to compel an accused to incriminate himself before a grand jury, or at the trial, but cannot do so in the police station.  Frank recognition of the fact that the Due Process Clause prohibits the States from enforcing their laws by compelling the accused to confess, regardless of where such compulsion occurs, would not only clarify the principles involved in confession cases, but would assist the States significantly in their efforts to comply with the limitations placed upon them by the Fourteenth Amendment."

vidual guarantees of the Bill of Rights," *Ohio ex rel. Eaton v. Price,* 364 U. S. 263, 275 (dissenting opinion). If *Cohen* v. *Hurley,* 366 U. S. 117, and *Adamson* v. *California, supra,* suggest such an application of the privilege against self-incrimination, that suggestion cannot survive recognition of the degree to which the *Twining* view of the privilege has been eroded. What is accorded is a privilege of refusing to incriminate one's self, and the feared prosecution may be by either federal or state authorities. *Murphy* v. *Waterfront Comm'n, post,* p. 52. It would be incongruous to have different standards determine the validity of a claim of privilege based on the same feared prosecution, depending on whether the claim was asserted in a state or federal court. Therefore, the same standards must determine whether an accused's silence in either a federal or state proceeding is justified.

We turn to the petitioner's claim that the State of Connecticut denied him the protection of his federal privilege. It must be considered irrelevant that the petitioner was a witness in a statutory inquiry and not a defendant in a criminal prosecution, for it has long been settled that the privilege protects witnesses in similar federal inquiries. *Counselman* v. *Hitchcock,* 142 U. S. 547; *McCarthy* v. *Arndstein,* 266 U. S. 34; *Hoffman* v. *United States,* 341 U. S. 479. We recently elaborated the content of the federal standard in *Hoffman:*

> "The privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute . . . . [I]f the witness, upon interposing his claim, were required to prove the hazard . . . he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is

asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U. S., at 486–487.

We also said that, in applying that test, the judge must be

" 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have such tendency' to incriminate." 341 U. S., at 488.

The State of Connecticut argues that the Connecticut courts properly applied the federal standards to the facts of this case. We disagree.

The investigation in the course of which petitioner was questioned began when the Superior Court in Hartford County appointed the Honorable Ernest A. Inglis, formerly Chief Justice of Connecticut, to conduct an inquiry into whether there was reasonable cause to believe that crimes, including gambling, were being committed in Hartford County. Petitioner appeared on January 16 and 25, 1961, and in both instances he was asked substantially the same questions about the circumstances surrounding his arrest and conviction for pool selling in late 1959. The questions which petitioner refused to answer may be summarized as follows: (1) for whom did he work on September 11, 1959; (2) who selected and paid his counsel in connection with his arrest on that date and subsequent conviction; (3) who selected and paid his bondsman; (4) who paid his fine; (5) what was the name of the tenant of the apartment in which he was arrested; and (6) did he know John Bergoti. The Connecticut Supreme Court of Errors ruled that the answers to these questions could not tend to incriminate him because the defenses of double jeopardy and the running of the one-year statute of limitations on misdemeanors would defeat any prosecution growing out of his answers to the first

five questions. As for the sixth question, the court held that petitioner's failure to explain how a revelation of his relationship with Bergoti would incriminate him vitiated his claim to the protection of the privilege afforded by state law.

The conclusions of the Court of Errors, tested by the federal standard, fail to take sufficient account of the setting in which the questions were asked. The interrogation was part of a wide-ranging inquiry into crime, including gambling, in Hartford. It was admitted on behalf of the State at oral argument—and indeed it is obvious from the questions themselves—that the State desired to elicit from the petitioner the identity of the person who ran the pool-selling operation in connection with which he had been arrested in 1959. It was apparent that petitioner might apprehend that if this person were still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted.[9]

Analysis of the sixth question, concerning whether petitioner knew John Bergoti, yields a similar conclusion. In the context of the inquiry, it should have been apparent to the referee that Bergoti was suspected by the State to be involved in some way in the subject matter of the investigation. An affirmative answer to the question

---

[9] See *Greenberg* v. *United States,* 343 U. S. 918, reversing *per curiam,* 192 F. 2d 201; *Singleton* v. *United States,* 343 U. S. 944, reversing *per curiam,* 193 F. 2d 464. In *United States* v. *Coffey,* 198 F. 2d 438 (C. A. 3d Cir.), cited with approval in *Emspak* v. *United States,* 349 U. S. 190, the Court of Appeals for the Third Circuit stated:

"in determining whether the witness really apprehends danger in answering a question, the judge cannot permit himself to be skeptical; rather must he be acutely aware that in the deviousness of crime and its detection incrimination may be approached and achieved by obscure and unlikely lines of inquiry." 198 F. 2d, at 440–441.

might well have either connected petitioner with a more recent crime, or at least have operated as a waiver of his privilege with .reference to his relationship with a possible criminal. See *Rogers* v. *United States,* 340 U. S. 367. We conclude, therefore, that as to each of the questions, it was "evident from the implications of the question, in the setting in which it [was] asked, that a responsive answer to the question or an explanation of why it [could not] be answered might be dangerous because injurious disclosure could result," *Hoffman* v. *United States,* 341 U. S., at 486–487; see *Singleton* v. *United States,* 343 U. S. 944.

*Reversed.*

While MR. JUSTICE DOUGLAS joins the opinion of the Court, he also adheres to his concurrence in *Gideon* v. *Wainwright,* 372 U. S. 335, 345.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, dissenting.

Connecticut has adjudged this petitioner in contempt for refusing to answer questions in a state inquiry. The courts of the State, whose laws embody a privilege against self-incrimination, refused to recognize the petitioner's claim of privilege, finding that the questions asked him were not incriminatory. This Court now holds the contempt adjudication unconstitutional because, it is decided: (1) the Fourteenth Amendment makes the Fifth Amendment privilege against self-incrimination applicable to the States; (2). the federal standard justifying a claim of this privilege likewise applies to the States; and (3) judged by that standard the petitioner's claim of privilege should have been upheld.

Believing that the reasoning behind the Court's decision carries extremely mischievous, if not dangerous, consequences for our federal system in the realm of criminal

law enforcement, I must dissent. The importance of the issue presented and the serious incursion which the Court makes on time-honored, basic constitutional principles justify a full exposition of my reasons.

## I.

I can only read the Court's opinion as accepting in fact what it rejects in theory: the application to the States, via the Fourteenth Amendment, of the forms of federal criminal procedure embodied within the first eight Amendments to the Constitution. While it is true that the Court deals today with only one aspect of state criminal procedure, and rejects the wholesale "incorporation" of such federal constitutional requirements, the logical gap between the Court's premises and its novel constitutional conclusion can, I submit, be bridged only by the additional premise that the Due Process Clause of the Fourteenth Amendment is a shorthand directive to this Court to pick and choose among the provisions of the first eight Amendments and apply those chosen, freighted with their entire accompanying body of federal doctrine, to law enforcement in the States.

I accept and agree with the proposition that continuing re-examination of the constitutional conception of Fourteenth Amendment "due process" of law is required, and that development of the community's sense of justice may in time lead to expansion of the protection which due process affords. In particular in this case, I agree that principles of justice to which due process gives expression, as reflected in decisions of this Court, prohibit a State, as the Fifth Amendment prohibits the Federal Government, from imprisoning a person *solely* because he refuses to give evidence which may incriminate him under the laws of the State.[1] I do not understand, how-

---

[1] That precise question has not heretofore been decided by this Court. *Twining* v. *New Jersey*, 211 U. S. 78, and the cases which

ever, how this process of re-examination, which must refer always to the guiding standard of due process of law, including, of course, reference to the particular guarantees of the Bill of Rights, can be short-circuited by the simple device of incorporating into due process, without critical examination, the whole body of law which surrounds a specific prohibition directed against the Federal Government. The consequence of such an approach to due process as it pertains to the States is inevitably disregard of all relevant differences which may exist between state and federal criminal law and its enforcement. The ultimate result is compelled uniformity, which is inconsistent with the purpose of our federal system and which is achieved either by encroachment on the States' sov-

---

followed it, see *infra*, p. 17, all involved issues not precisely similar. Although the Court has stated broadly that an individual could "be required to incriminate himself in . . . state proceedings," *Cohen* v. *Hurley*, 366 U. S. 117, 127, the context in which such statements were made was that the State had in each case recognized the right to remain silent. In *Twining, supra*, until now the primary authority, the Court noted that "all the States of the Union have, from time to time, with varying form but uniform meaning, included the privilege in their constitutions, except the States of New Jersey and Iowa, and in those States it is held to be part of the existing law." 211 U. S., at 92.

While I do not believe that the coerced confession cases furnish any basis for incorporating the Fifth Amendment into the Fourteenth, see *infra*, pp. 17–20, they do, it seems to me, carry an implication that coercion to incriminate oneself, even when under the forms of law, cf. *Brown* v. *Mississippi*, 297 U. S. 278, 285, discussed *infra*, pp. 17–18, is inconsistent with due process. Since every State already recognizes a privilege against self-incrimination so defined, see VIII Wigmore, Evidence (McNaughton rev. 1961), § 2252, the effect of including such a privilege in due process is only to create the possibility that a federal question, to be decided under the Due Process Clause, would be raised by a State's refusal to accept a claim of the privilege.

ereign powers or by dilution in federal law enforcement of the specific protections found in the Bill of Rights.

## II.

As recently as 1961, this Court reaffirmed that "the Fifth Amendment's privilege against self-incrimination," *ante,* p. 3, was not applicable against the States. *Cohen* v. *Hurley,* 366 U. S. 117. The question had been most fully explored in *Twining* v. *New Jersey,* 211 U. S. 78. Since 1908, when *Twining* was decided, this Court has adhered to the view there expressed that "the exemption from compulsory self-incrimination in the courts of the States is not secured by any part of the Federal Constitution," 211 U. S., at 114. *Snyder* v. *Massachusetts,* 291 U. S. 97, 105; *Brown* v. *Mississippi,* 297 U. S. 278, 285; *Palko* v. *Connecticut,* 302 U. S. 319, 324; *Adamson* v. *California,* 332 U. S. 46; *Knapp* v. *Schweitzer,* 357 U. S. 371, 374; *Cohen, supra.* Although none of these cases involved a commitment to prison for refusing to incriminate oneself under state law, and they are relevantly distinguishable from this case on that narrow ground,[2] it is perfectly clear from them that until today it has been regarded as settled law that the *Fifth Amendment* privilege did not, by any process of reasoning, apply *as such* to the States.

The Court suggests that this consistent line of authority has been undermined by the concurrent development of constitutional doctrine in the areas of coerced confessions and search and seizure. This is *post facto* reasoning at best. Certainly there has been no intimation until now that *Twining* has been tacitly overruled.

It was in *Brown* v. *Mississippi, supra,* that this Court first prohibited the use of a coerced confession in a state criminal trial. The petitioners in *Brown* had been tor-

---

[2] See note 1, *supra.*

18

tured until they confessed. The Court was hardly making an artificial distinction when it said:

". . . [T]he question of the right of the State to withdraw the privilege against self-incrimination is not here involved. The compulsion to which the quoted statements [from *Twining* and *Snyder, supra,*] refer is that of the *processes of justice* by which the accused may be called as a witness and required to testify. *Compulsion by torture* to extort a confession is a different matter." [3]  297 U. S., at 285.  (Emphasis supplied.)

The majority is simply wrong when it asserts that this perfectly understandable distinction "was soon abandoned," *ante,* pp. 6–7.  In none of the cases cited, *ante,* pp. 7–8, in which was developed the full sweep of the constitutional prohibition against the use of coerced confessions at state trials, was there anything to suggest that the Fifth Amendment was being made applicable to state proceedings.  In *Lisenba* v. *California,* 314 U. S. 219, the privilege against self-incrimination is not mentioned. The relevant question before the Court was whether "the evidence [of coercion] requires that we set aside the finding of two courts and a jury, and adjudge the admission of the confessions so fundamentally unfair, so contrary to the common concept of ordered liberty, as to amount to a taking of life without due process of law." *Id.,* at 238. The question was the same in *Ashcraft* v. *Tennessee,* 322 U. S. 143; the Court there adverted to the "third degree," *e. g., id.,* at 150, note 5, and "secret inquisitorial prac-

---

[3] Nothing in the opinion in *Brown* supports the Court's intimation here, *ante,* p. 6, that if *Twining* had not been on the books, reversal of the convictions would have been based on the Fifth Amendment. The Court made it plain in *Brown* that it regarded the trial use of a confession extracted by torture as on a par with domination of a trial by a mob, see, *e. g., Moore* v. *Dempsey,* 261 U. S. 86, where the trial "is a mere pretense," 297 U. S., at 286.

tices," *id.,* at 152. *Malinski* v. *New York,* 324 U. S. 401, is the same; the privilege against self-incrimination is not mentioned.[4] So too in *Spano* v. *New York,* 360 U. S. 315; *Lynumn* v. *Illinois,* 372 U. S. 528; and *Haynes* v. *Washington,* 373 U. S. 503. Finally, in *Rogers* v. *Richmond,* 365 U. S. 534, although the Court did recognize that "ours is an accusatorial and not an inquisitorial system," *id.,* at 541, it is clear that the Court was concerned only with the problem of coerced confessions, see *ibid.;* the opinion includes nothing to support the Court's assertion here, *ante,* p. 7, that "the Fifth Amendment privilege is . . . [the] essential mainstay" of our system.

In *Adamson, supra,* the Court made it explicit that it did not regard the increasingly strict standard for determining the admissibility at trial of an out-of-court confession as undermining the holding of *Twining.* After stating that "the due process clause does not protect, by virtue of its mere existence, the accused's freedom from giving testimony by compulsion in state trials that is secured to him against federal interference by the Fifth Amendment," the Court said: "The due process clause forbids compulsion to testify by fear of hurt, torture or exhaustion. It forbids any other type of coercion that falls within the scope of due process." 332 U. S., at 54

---

[4] "And so, when a conviction in a state court is properly here for review, under a claim that a right protected by the Fourteenth Amendment has been denied, the question is not whether the record can be found to disclose an infraction of one of the specific provisions of the first eight amendments. To come concretely to the present case, the question is not whether the record permits a finding, by a tenuous process of psychological assumptions and reasoning, that Malinski by means of a confession was forced to self-incrimination in defiance of the Fifth Amendment. The exact question is whether the criminal proceedings which resulted in his conviction deprived him of the due process of law by which he was constitutionally entitled to have his guilt determined." *Malinski, supra,* at 416 (opinion of Frankfurter, J.).

(footnotes omitted). Plainly, the Court regarded these two lines of cases as distinct. See also *Palko* v. *Connecticut, supra,* at 326, to the same effect.[5] *Cohen, supra,* which adhered to *Twining,* was decided after all but a few of the confession cases which the Court mentions.

The coerced confession cases are relevant to the problem of this case not because they overruled *Twining sub silentio,* but rather because they applied the same standard of fundamental fairness which is applicable here. The recognition in them that federal supervision of state criminal procedures must be directly based on the requirements of due process is entirely inconsistent with the theory here espoused by the majority. The parallel treatment of federal and state cases involving coerced confessions resulted from the fact that the same demand of due process was applicable in both; it was not the consequence of the automatic engrafting of federal law construing constitutional provisions inapplicable to the States onto the Fourteenth Amendment.

The decision in *Mapp* v. *Ohio,* 367 U. S. 643, that evidence unconstitutionally seized, see *Wolf* v. *Colorado,* 338 U. S. 25, 28, may not be used in a state criminal trial furnishes no "fortification," see *ante,* p. 8, for today's decision. The very passage from the *Mapp* opinion which the Court quotes, *ante,* p. 9, makes explicit the distinct bases of the exclusionary rule as applied in federal and state courts:

> "We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation'

---

[5] In *Adamson* and *Palko, supra,* which adhered to the rule announced in *Twining, supra,* the Court cited some of the very cases now relied on by the majority to show that *Twining* was gradually being eroded. 332 U. S., at 54, notes 12, 13; 302 U. S., at 325, 326.

in their perpetuation of 'principles of humanity and civil liberty [secured] . . . only after years of struggle,' *Bram* v. *United States,* 168 U. S. 532, 543–544 (1897)." 367 U. S., at 656–657 (footnote omitted). See also *id.,* at 655.

Although the Court discussed *Boyd* v. *United States,* 116 U. S. 616, a federal case involving both the Fourth and Fifth Amendments, nothing in *Mapp* supports the statement, *ante,* p. 8, that the Fifth Amendment was part of the basis for extending the exclusionary rule to the States. The elaboration of *Mapp* in *Ker* v. *California,* 374 U. S. 23, did in my view make the Fourth Amendment applicable to the States through the Fourteenth; but there is nothing in it to suggest that the Fifth Amendment went along as baggage.

### III.

The previous discussion shows that this Court's decisions do not dictate the "incorporation" of the Fifth Amendment's privilege against self-incrimination into the Fourteenth Amendment. Approaching the question more broadly, it is equally plain that the line of cases exemplified by *Palko* v. *Connecticut, supra,* in which this Court has reconsidered the requirements which the Due Process Clause imposes on the States in the light of current standards, furnishes no general theoretical framework for what the Court does today.

The view of the Due Process Clause of the Fourteenth Amendment which this Court has consistently accepted and which has "thus far prevailed," *ante,* p. 4, is that its requirements are as "old as a principle of civilized government," *Munn* v. *Illinois,* 94 U. S. 113, 123, the specific applications of which must be ascertained "by the gradual process of judicial inclusion and exclusion . . . ," *Davidson* v. *New Orleans,* 96 U. S. 97, 104. Due process requires "observance of those general rules established in our system of jurisprudence for the security of private

rights." *Hagar* v. *Reclamation District No. 108,* 111 U. S. 701, 708.   See *Hurtado* v. *California,* 110 U. S. 516, 537.

> "This court has never attempted to define with precision the words 'due process of law' . . . .   It is sufficient to say that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard . . . ."   *Holden* v. *Hardy,* 169 U. S. 366, 389.

It followed from this recognition that due process encompassed the fundamental safeguards of the individual against the abusive exercise of governmental power that some of the restraints on the Federal Government which were specifically enumerated in the Bill of Rights applied also against the States.   But, while inclusion of a particular provision in the Bill of Rights might provide historical evidence that the right involved was traditionally regarded as fundamental, inclusion of the right in due process was otherwise entirely independent of the first eight Amendments:

> ". . . [I]t is possible that some of the personal rights safeguarded by the first eight Amendments against National action may also be safeguarded against state action, because a denial of them would be a denial of due process of law. . . .   *If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in the conception of due process of law."*   *Twining, supra,* at 99.   (Emphasis supplied.)

Relying heavily on *Twining,* Mr. Justice Cardozo provided what may be regarded as a classic expression of this approach in *Palko* v. *Connecticut, supra.*   After considering a number of individual rights (including the right

not to incriminate oneself) which were "not of the very essence of a scheme of ordered liberty," *id.*, at 325, he said:

> "We reach a different plane of social and moral values when we pass to the privileges and immunities that have been taken over from the earlier articles of the federal bill of rights and brought within the Fourteenth Amendment by a process of absorption. These in their origin were effective against the federal government alone. If the Fourteenth Amendment has absorbed them, the process of absorption has had its source in the belief that neither liberty nor justice would exist if they were sacrificed." *Id.*, at 326.

Further on, Mr. Justice Cardozo made the independence of the Due Process Clause from the provisions of the first eight Amendments explicit:

> "Fundamental . . . in the concept of due process, and so in that of liberty, is the thought that condemnation shall be rendered only after trial. *Scott* v. *McNeal,* 154 U. S. 34; *Blackmer* v. *United States,* 284 U. S. 421. The hearing, moreover, must be a real one, not a sham or a pretense. *Moore* v. *Dempsey,* 261 U. S. 86; *Mooney* v. *Holohan,* 294 U. S. 103. For that reason, ignorant defendants in a capital case were held to have been condemned unlawfully when in truth, though not in form, they were refused the aid of counsel. *Powell* v. *Alabama, supra,* pp. 67, 68. The decision did not turn upon the fact that the benefit of counsel would have been guaranteed to the defendants by the provisions of the Sixth Amendment if they had been prosecuted in a federal court. The decision turned upon the fact that in the particular situation laid before us in the evidence the benefit of counsel was essential to the substance of a hearing." *Id.*, at 327.

It is apparent that Mr. Justice Cardozo's metaphor of "absorption" was *not* intended to suggest the transplantation of case law surrounding the specifics of the first eight Amendments to the very different soil of the Fourteenth Amendment's Due Process Clause. For, as he made perfectly plain, what the Fourteenth Amendment requires of the States does not basically depend on what the first eight Amendments require of the Federal Government.

Seen in proper perspective, therefore, the fact that First Amendment protections have generally been given equal scope in the federal and state domains or that in some areas of criminal procedure the Due Process Clause demands as much of the States as the Bill of Rights demands of the Federal Government, is only tangentially relevant to the question now before us. It is toying with constitutional principles to assert that the Court has "rejected the notion that the Fourteenth Amendment applies to the states only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights,'" *ante,* pp. 10–11. What the Court has, with the single exception of the *Ker* case, *supra,* p. 21; see *infra,* p. 26, consistently rejected is the notion that the Bill of Rights, as such, applies to the States in any aspect at all.

If one attends to those areas to which the Court points, *ante,* p. 10, in which the prohibitions against the state and federal governments have moved in parallel tracks, the cases in fact reveal again that the Court's usual approach has been to ground the prohibitions against state action squarely on due process, without intermediate reliance on any of the first eight Amendments. Although more recently the Court has referred to the First Amendment to describe the protection of free expression against state infringement, earlier cases leave no doubt that such references are "shorthand" for doctrines developed by an-

other route. In *Gitlow* v. *New York,* 268 U. S. 652, 666,' for example, the Court said:

> "For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."

The Court went on to consider the extent of those freedoms in the context of state interests. Mr. Justice Holmes, in dissent, said:

> "The general principle of free speech, it seems to me, must be taken to be included in the Fourteenth Amendment, in view of the scope that has been given to the word 'liberty' as there used, although perhaps it may be accepted with a somewhat larger latitude of interpretation than is allowed to Congress by the sweeping language that governs or ought to govern the laws of the United States." *Id.,* at 672.

Chief Justice Hughes, in *De Jonge* v. *Oregon,* 299 U. S. 353, 364, gave a similar analysis:

> "Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution. . . . The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. As this Court said in *United States* v. *Cruikshank,* 92 U. S. 542, 552: 'The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.' The First Amendment of the Federal Constitution expressly guarantees that right against abridgment

by Congress. But explicit mention there does not argue exclusion elsewhere. For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions,—principles which the Fourteenth Amendment embodies in the general terms of its due process clause."

The coerced confession and search and seizure cases have already been considered. The former, decided always directly on grounds of fundamental fairness, furnish no support for the Court's present views. *Ker* v. *California, supra,* did indeed incorporate the Fourth Amendment's protection against invasions of privacy into the Due Process Clause. But that case should be regarded as the exception which proves the rule.[6] The right to counsel in state criminal proceedings, which this Court assured in *Gideon* v. *Wainwright,* 372 U. S. 335, does not depend on the Sixth Amendment. In *Betts* v. *Brady,* 316 U. S. 455, 462, this Court had said:

"Due process of law is secured against invasion by the federal Government by the Fifth Amendment, and is safeguarded against state action in identical words by the Fourteenth. The phrase formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." (Footnote omitted.)

---

[6] Cf. the majority and dissenting opinions in *Aguilar* v. *Texas, post,* p. 108.

Although *Gideon* overruled *Betts,* the constitutional approach in both cases was the same. *Gideon* was based on the Court's conclusion, contrary to that reached in *Betts,* that the appointment of counsel for an indigent criminal defendant *was* essential to the conduct of a fair trial, and was therefore part of due process. 372 U. S., at 342–345.

The Court's approach in the present case is in fact nothing more or less than "incorporation" in snatches. If, however, the Due Process Clause *is* something more than a reference to the Bill of Rights and protects only those rights which derive from fundamental principles, as the majority purports to believe, it is just as contrary to precedent and just as illogical to incorporate the provisions of the Bill of Rights one at a time as it is to incorporate them all at once.

## IV.

The Court's undiscriminating approach to the Due Process Clause carries serious implications for the sound working of our federal system in the field of criminal law.

The Court concludes, almost without discussion. that "the same standards must determine whether an accused's silence in either a federal or state proceeding is justified," *ante,* p. 11. About all that the Court offers in explanation of this conclusion is the observation that it would be "incongruous" if different standards governed the assertion of a privilege to remain silent in state and federal tribunals. Such "incongruity," however, is at the heart of our federal system. The powers and responsibilities of the state and federal governments are not congruent; under our Constitution, they are not intended to be. Why should it be thought, as an *a priori* matter, that limitations on the investigative power of the States are in all respects identical with limitations on the investigative power of the Federal Government? This cer-

tainly does not follow from the fact that we deal here with constitutional requirements; for the provisions of the Constitution which are construed are different.

As the Court pointed out in *Abbate* v. *United States,* 359 U. S. 187, 195, "the States under our federal system have the principal responsibility for defining and prosecuting crimes." The Court endangers this allocation of responsibility for the prevention of crime when it applies to the States doctrines developed in the context of federal law enforcement, without any attention to the special problems which the States as a group or particular States may face. If the power of the States to deal with local crime is unduly restricted, the likely consequence is a shift of responsibility in this area to the Federal Government, with its vastly greater resources. Such a shift, if it occurs, may in the end serve to weaken the very liberties which the Fourteenth Amendment safeguards by bringing us closer to the monolithic society which our federalism rejects. Equally dangerous to our liberties is the alternative of watering down protections against the Federal Government embodied in the Bill of Rights so as not unduly to restrict the powers of the States. The dissenting opinion in *Aguilar* v. *Texas, post,* p. 116, evidences that this danger is not imaginary. See my concurring opinion in *Aguilar, ibid.*

Rather than insisting, almost by rote, that the Connecticut court, in considering the petitioner's claim of privilege, was required to apply the "federal standard," the Court should have fulfilled its responsibility under the Due Process Clause by inquiring whether the proceedings below met the demands of fundamental fairness which due process embodies. Such an approach may not satisfy those who see in the Fourteenth Amendment a set of easily applied "absolutes" which can afford a haven from unsettling doubt. It is, however, truer to the spirit which requires this Court constantly to re-examine funda-

mental principles and at the same time enjoins it from reading its own preferences into the Constitution.

The Connecticut Supreme Court of Errors gave full and careful consideration to the petitioner's claim that he would incriminate himself if he answered the questions put to him. It noted that its decisions "from a time antedating the adoption of . . . [the Connecticut] constitution in 1818" had upheld a privilege to refuse to answer incriminating questions. 150 Conn. 220, 223, 187 A. 2d 744, 746. Stating that federal cases treating the Fifth Amendment privilege had "persuasive force" in interpreting its own constitutional provision, and citing *Hoffman* v. *United States*, 341 U. S. 479, in particular, the Supreme Court of Errors described the requirements for assertion of the privilege by quoting from one of its own cases, 150 Conn., at 225, 187 A. 2d, at 747:

> "[A] witness . . . has the right to refuse to answer any question which would tend to incriminate him. But a mere claim on his part that the evidence will tend to incriminate him is not sufficient. . . . [He having] made his claim, it is then . . . [necessary for the judge] to determine in the exercise of a legal discretion whether, from the circumstances of the case and the nature of the evidence which the witness is called upon to give, there is reasonable ground to apprehend danger of criminal liability from his being compelled to answer. That danger 'must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things— not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. We think that a merely remote and naked possibility, out of the ordinary course of law and such as no reasonable man would be affected by,

should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios,* protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice.' Cockburn, C. J., in *Regina* v. *Boyes,* 1 B. & S. 311, 330 . . . ." *McCarthy* v. *Clancy,* 110 Conn. 482, 488–489, 148 A. 551, 555.

The court carefully applied the above standard to each question which the petitioner was asked. It dealt first with the question whether he knew John Bergoti. The court said:

"Bergoti is nowhere described or in any way identified, either as to his occupation, actual or reputed, or as to any criminal record he may have had. . . . Malloy made no attempt even to suggest to the court how an answer to the question whether he knew Bergoti could possibly incriminate him. . . . On this state of the record the question was proper, and Malloy's claim of privilege, made without explanation, was correctly overruled. Malloy 'chose to keep the door tightly closed and to deny the court the smallest glimpse of the danger he apprehended. He cannot then complain that we see none.' *In re Pillo,* 11 N. J. 8, 22, 93 A. 2d 176 . . . ." 150 Conn., at 226–227, 187 A. 2d, at 748.

The remaining questions are summarized in the majority's opinion, *ante,* p. 12. All of them deal with the circumstances surrounding the petitioner's conviction on a gambling charge in 1959. The court declined to decide

"whether, on their face and apart from any consideration of Malloy's immunity from prosecution, the questions should or should not have been answered in the light of his failure to give any hint of explanation as to how answers to them could incriminate him." 150 Conn., at 227, 187 A. 2d, at 748. The court considered the State's claim that the petitioner's prior conviction was sufficient to clothe him with immunity from prosecution for other crimes to which the questions might pertain, but declined to rest its decision on that basis. *Id.*, at 227–229, 187 A. 2d, at 748–749. The court concluded, however, that the running of the statute of limitations on misdemeanors committed in 1959 and the absence of any indication that Malloy had engaged in any crime other than a misdemeanor removed all appearance of danger of incrimination from the questions propounded concerning the petitioner's activities in 1959. The court summarized this conclusion as follows:

> "In all this, Malloy confounds vague and improbable possibilities of prosecution with reasonably appreciable ones. Under claims like his, it would always be possible to work out some finespun and improbable theory from which an outside chance of prosecution could be envisioned. Such claims are not enough to support a claim of privilege, at least where, as here, a witness suggests no rational explanation of his fears of incrimination, and the questions themselves, under all the circumstances, suggest none."
> *Id.*, at 230–231, 187 A. 2d, at 750.

Peremptorily rejecting all of the careful analysis of the Connecticut court, this Court creates its own "finespun and improbable theory" about how these questions might have incriminated the petitioner. With respect to his acquaintance with Bergoti, this Court says only:

> "In the context of the inquiry, it should have been apparent to the referee that Bergoti was suspected

by the State to be involved in some way in the subject matter of the investigation. An affirmative answer to the question might well have either connected petitioner with a more recent crime, or at least have operated as a waiver of his privilege with reference to his relationship with a possible criminal." *Ante,* pp. 13–14.

The other five questions, treated at length in the Connecticut court's opinion, get equally short shrift from this Court; it takes the majority, unfamiliar with Connecticut law and far removed from the proceedings below, only a dozen lines to consider the questions and conclude that they were incriminating:

> "The interrogation was part of a wide-ranging inquiry into crime, including gambling, in Hartford. It was admitted on behalf of the State at oral argument—and indeed it is obvious from the questions themselves—that the State desired to elicit from the petitioner the identity of the person who ran the pool-selling operation in connection with which he had been arrested in 1959. It was apparent that petitioner might apprehend that if this person were still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted." (Footnote omitted.) *Ante,* p. 13.

I do not understand how anyone could read the opinion of the Connecticut court and conclude that the state law which was the basis of its decision or the decision itself was lacking in fundamental fairness. The truth of the matter is that under any standard—state or federal—the commitment for contempt was proper. Indeed, as indicated above, there is every reason to believe that the Connecticut court did apply the *Hoffman* standard

quoted approvingly in the majority's opinion. I entirely agree with my Brother WHITE, *post,* pp. 36–38, that if the matter is viewed only from the standpoint of the federal standard, such standard was fully satisfied. The Court's reference to a federal standard is, to put it bluntly, simply an excuse for the Court to substitute its own superficial assessment of the facts and state law for the careful and better informed conclusions of the state court. No one who scans the two opinions with an objective eye will, I think, reach any other conclusion.

I would affirm.

MR. JUSTICE WHITE, with whom MR. JUSTICE STEWART joins, dissenting.

I.

The Fifth Amendment safeguards an important complex of values, but it is difficult for me to perceive how these values are served by the Court's holding that the privilege was properly invoked in this case. While purporting to apply the prevailing federal standard of incrimination—the same standard of incrimination that the Connecticut courts applied—the Court has all but stated that a witness' invocation of the privilege to any question is to be automatically, and without more, accepted. With deference, I prefer the rule permitting the judge rather than the witness to determine when an answer sought is incriminating.

The established rule has been that the witness' claim of the privilege is not final, for the privilege qualifies a citizen's general duty of disclosure only when his answers would subject him to danger from the criminal law. The privilege against self-incrimination or any other evidentiary privilege does not protect silence which is solely an expression of political protest, a desire not to inform, a fear of social obloquy or economic disadvantage or fear of prosecution for future crimes. *Smith* v. *United States,*

337 U. S. 137, 147; *Brown* v. *Walker,* 161 U. S. 591, 605. If the general duty to testify when subpoenaed is to remain and the privilege is to be retained as a protection against compelled incriminating answers, the trial judge must be permitted to make a meaningful determination of when answers tend to incriminate. See *The Queen* v. *Boyes,* 1 B. & S. 311, 329–330 (1861); *Mason* v. *United States,* 244 U. S. 362. I do not think today's decision permits such a determination.

Answers which would furnish a lead to other evidence needed to prosecute or convict a claimant of a crime—clue evidence—cannot be compelled, but "this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman* v. *United States,* 341 U. S. 479, at 486; *Mason* v. *United States,* 244 U. S. 362. Of course the witness is not required to disclose so much of the danger as to render his privilege nugatory. But that does not justify a flat rule of no inquiry and automatic acceptance of the claim of privilege. In determining whether the witness has a reasonable apprehension, the test in the federal courts has been that the judge is to decide from the circumstances of the case, his knowledge of matters surrounding the inquiry and the nature of the evidence which is demanded from the witness. *Hoffman* v. *United States,* 341 U. S. 479; *Mason* v. *United States,* 244 U. S. 362. Cf. *Rogers* v. *United States,* 340 U. S. 367. This rule seeks and achieves a workable accommodation between what are obviously important competing interests. As Mr. Chief Justice Marshall said: "The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. . . . When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness." *In*

*re Willie,* 25 Fed. Cas. No. 14,692e, at 39–40. I would not only retain this rule but apply it in its present form. Under this test, Malloy's refusals to answer some, if not all, of the questions put to him were clearly not privileged.

## II.

In November 1959, Malloy was arrested in a gambling raid in Hartford and was convicted of pool selling, an offense defined as occupying and keeping a building containing gambling apparatus. After a 90-day jail term, his one-year sentence was suspended and Malloy was placed on probation for two years. In early 1961, Malloy was summoned to appear in an investigation into whether crimes, including gambling, had been committed in Hartford County, and was asked various questions obviously and solely designed to ascertain who Malloy's associates were in connection with his pool-selling activities in Hartford in 1959. Malloy initially refused to answer virtually all the questions put to him, including such innocuous ones as whether he was the William Malloy arrested and convicted of pool selling in 1959. After he was advised to consult with counsel and did so, he declined to answer each one of the following questions on the ground that it would tend to incriminate him:

"Q. Now, on September 11, 1959, when you were arrested at 600 Asylum Street, and the same arrest for which you were convicted in the Superior Court on November 5, 1959, for whom were you working?

. . . . .

"Q. On September 11, 1959, when you were arrested, and the same arrest for which you were convicted in the Superior Court on November 5, 1959, who furnished the money to pay your fine when you were convicted in the Superior Court?

. . . . .

"Q. After your arrest on September 11, 1959, and the same arrest for which you were convicted on November 5, 1959, who selected your bondsman?

.    .    .    .    .

"Q. As a result of your arrest on September 11, 1959, and the same arrest for which you were convicted on November 5, 1959, who furnished the money to pay your fine?

.    .    .    .    .

"Q. Do you know whose apartment it was [that you were arrested in on September 11, 1959]?

.    .    .    .    .

"Q. Do you know John Bergoti?

.    .    .    .    .

"Q. I ask you again, Mr. Malloy, now, so there will be no misunderstanding of what I want to know. When you were arrested on September 11, 1959, at 600 Asylum Street in Hartford, and the same arrest for which you were convicted in Superior Court on November 5, 1959, for whom were you working?"

It was for refusing to answer these questions that Malloy was cited for contempt, the Connecticut courts noting that the privilege does not protect one against informing on friends or associates.

These were not wholly innocuous questions on their face, but they clearly were in light of the finding, of which Malloy was told, that he was immune from prosecution for any pool-selling activities in 1959. As the Connecticut Supreme Court of Errors found, the State bore its burden of proving that the statute of limitations barred any prosecution for any type of violation of the state pool-selling statute in 1959. Malloy advanced the claim before the Connecticut courts, and again before this Court, that he could perhaps be prosecuted for a conspiracy and that the statute of limitations on a felony was

five years. But the Connecticut courts were unable to find any state statute which Malloy's gambling activities in 1959 in Hartford, the subject of the inquiry, could have violated and Malloy has not yet pointed to one. Beyond this Malloy declined to offer any explanation or hint at how the answers sought could have incriminated him. In these circumstances it is wholly speculative to find that the questions about others, not Malloy, posed a substantial hazard of criminal prosecution to Malloy. Theoretically, under some unknown but perhaps possible conditions any fact is potentially incriminating. But if this be the rule, there obviously is no reason for the judge, rather than the witness, to pass on the claim of privilege. The privilege becomes a general one against answering distasteful questions.

The Court finds that the questions were incriminating because petitioner "might apprehend that if [his associates in 1959] were still engaged in unlawful activity, disclosure of [their names] might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted." *Ante,* p. 13. The assumption necessary to the above reasoning is that all persons, or all who have committed a misdemeanor, are continuously engaged in crime. This is but another way of making the claim of privilege automatic. It is not only unrealistic generally but peculiarly inappropriate in this case. Unlike cases relied on by the Court, like *Hoffman* v. *United States, supra,* where the claimant was known to be involved in rackets in the area, which were the subject of the inquiry, and had a "broadly published police record," Malloy had no record as a felon. He had engaged once in an unlawful activity—pool selling—a misdemeanor and was given a suspended sentence. He had been on probation since that time and was on probation at the time of the inquiry. Again, unlike *Hoffman,* nothing in these questions indicates peti-

tioner was called because he was suspected of criminal activities after 1959. There is no support at all in this record for the cynical assumption that he had committed criminal acts after his release in 1960.

Even on the Court's assumption that persons convicted of a misdemeanor are necessarily suspect criminals, sustaining the privilege in these circumstances is unwarranted, for Malloy placed no reliance on this theory in the courts below or in this Court. In order to allow the judge passing on the claim to understand how the answers sought are incriminating, I would at least require the claimant to state his grounds for asserting the privilege to questions seemingly irrelevant to any incriminating matters.

Adherence to the federal standard of incrimination stated in *Mason* and *Hoffman, supra,* in form only, while its content is eroded in application, is hardly an auspicious beginning for application of the privilege to the States. As was well stated in a closely analogous situation, "[t]o continue a rule which is honored by this Court only with lip service is not a healthy thing and in the long run will do disservice to the federal system." *Gideon* v. *Wainwright,* 372 U. S. 335, at 351 (HARLAN, J., concurring).

I would affirm.