STATE v. FLETCHER ET AL.

[Cite as State v. Fletcher, 15 Ohio Misc. 336.]

(No. 86216—Decided May 15, 1968.)

Common Pleas Court of Cuyahoga County.

*Mr. Michael H. Farrin*, assistant county prosecutor, for the state.

*Mr. Henry S. Golland*, for defendant Michael Fletcher.

*Mr. Elmer A. Giuliani*, for defendant Willie Walker.

MANOS, J. On the 10th day of February, 1967, the defendants were indicted by a federal grand jury for a violation of Title 18, Section 2113, for the armed robbery of a federally insured banking institution. Defendant Fletcher entered a plea of guilty to this charge, but defendant Walker pleaded not guilty.

On the 1st day of May, 1967, a duly impanelled jury sitting in the Northern District of Ohio, Eastern Division, returned a verdict of ''not guilty'' to the above indictment as to defendant Walker. The defendants were also indicted by the Cuyahoga County Grand Jury for the same alleged offense. The facts recited in that indictment were substantially identical to those contained in the prior federal indictment. After the defendant Walker successfully defended the charge in federal court, the prosecutor imme-

diately pressed for trial on the state court indictment as against both defendants. The defendants entered a plea of former jeopardy and moved that the indictment be quashed. The state has responded by stating that the offense contained in the state indictment is an affront to the peace and dignity of the state of Ohio and is an offense separate from that for which the defendant was tried by the United States government. This court is therefore called upon to decide whether an accused who has been brought to trial and acquitted or convicted on a plea of guilty of a federal crime in a federal court may thereafter be prosecuted by state authorities in a state court for the same offense, if such offense is, in fact, a violation of state as well as federal law.

Although both the Fifth Amendment to the Constitution of the United States and Article I, Section 10 of the Ohio Constitution contain express prohibitions against subjecting any person to ''be twice put in jeopardy for the same offense,'' prosecutions for the same offense in turn by both federal and state authorities are, by the decided case law in Ohio and the United States Supreme Court, permissible. *State* v. *Shimman* (1930), 122 Ohio St. 522; *Bartkus* v. *Illinois* (1959), 359 U. S. 121.

It would appear, therefore, to be but a simple matter to reject the plea of double jeopardy of these defendants out of hand and proceed to trial against them again, this time in a state court, for offenses for which they have already been subjected to the risk of trial in a federal court. It would be a simple matter to do so but for the fact that this court for reasons which will be set out in detail below, is convinced that time and circumstance have so eroded the *Bartkus* decision, that that case is no longer a binding authority upon this court, that its dissenting opinions represent the current constitutional philosophy of a majority of the United States Supreme Court, and that, as the case at bar moves through its appellate stages, that court will so rule ultimately, thereby striking down, as a matter of fundamental due process, the Ohio case authority on the subject. So convinced, the court is faced with the grave question of whether its independent judicial function at the

trial level would best be served (1) by adhering narrowly and precisely to one holding in *Bartkus*, thereby compelling these defendants to stand trial again and to seek relief from the constraints of the *Bartkus* rule elsewhere than in this court, or (2) by anticipating the overruling of *Bartkus* upon appellate review and sustaining the validity of the plea of former jeopardy here and now. In the former instance, these defendants would be required to undergo the stress of a second trial before the ultimate fate of the *Bartkus* rule is known; in the latter instance, they would be subjected to the rigors of a trial again only, if and when, this court's notions of the weakness of *Bartkus* as binding constitutional doctrine have been laid to rest by specific contrary holding of appellate courts to whose authority this court is subject and whose power to reverse or alter trial court decisions is readily admitted.

If this court is to perform its responsibility to protect the rights of the accused and the integrity of the judicial process, it must not oppress these defendants with immediate risk of criminal conviction from which it regards them to be constitutionally immune, until the ultimate appellate authority has ruled otherwise. Presumably the law enforcement authorities in Cuyahoga County will seek appellate reversal of this trial court decision, and its author invites them to do so. If their vigorous and effective appellate presentation should persuade a superior court that this inferior court's view of *Bartkus* as a historic pile of rubble is in error, then and, only then, will this court permit the retrial of these defendants in an Ohio court. If their appellate arguments are unsuccessful, these defendants will not have been subjected needlessly to the rigors of standing trial before a second governmental authority for the same offense.

Accordingly, this court rules that the plea of former jeopardy of defendants Fletcher and Walker is well taken; that their motion to quash the indictments against them are granted; and that, to the extent that *Bartkus* v. *Illinois* and *State* v. *Shimmon* are inconsistent with this ruling, those decisions are deemed not to be binding authority upon this court.

We turn to consideration of this court's reasons for holding that the majority opinion in *Bartkus* is no longer precedent which this court is bound to follow.

In *Bartkus,* after a federal acquittal of a charge of robbery of a federally insured savings and loan association, the accused was tried in a state court for armed robbery and as a habitual criminal. Both state and federal prosecutions arose out of the same acts. The defense plea of double jeopardy was rejected and the accused was convicted of the state charge in the state court. After the state conviction had been affirmed by the state appellate courts, the United States Supreme Court granted certiorari and, in a 5-4 decision, once again affirmed the conviction.

The majority, testing successive federal and state prosecutions against the standards of the Fourteenth Amendment due process for the first time,[1] held that, even though double jeopardy was explicity prohibited by the Fifth Amendment to the United States Constitution, the defendant's exposure to both federal and state prosecution for the same offense was not constitutionally offensive.

The grounds upon which the majority upheld the double prosecution were (1) that neither the double jeopardy provision of the Fifth Amendment nor any of the other provisions of the first eight amendments to the Constitution of the United States were applicable to the states by operation of the Due Process Clause of the Fourteenth Amendment, 359 U. S. 121, 124-127; and (2) that the appropriate function of our federal system requires the application of the "two sovereignty" principle,[2] *id.* at 134, to defeat claims of double jeopardy arising out of successive

---

[1] Prior cases interpreted the Fifth Amendment's proscription of double jeopardy in successive state and federal prosecutions for the same offense. E. g., *United States* v. *Lanza* (1922), 260 U. S. 377; *Abbate* v. *United States* (1958), 359 U. S. 187.

[2] "Every citizen of the United States is also a citizen of a state or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both." "That either or both may (if they see fit) punish such an offender, cannot be doubted." *Moore* v. *Illinois* (1853), 14 How. 13, 20.

prosecutions in federal and state jurisdictions, 359 U. S. 121, 129-139.

Were this a matter of first impression, this court would be persuaded by neither of these arguments. For "[f]ear and abhorence of governmental power to try people twice for the same conduct is one of the oldest ideas found in western civilization. Its roots run deep into Greek and Roman times." *Bartkus* v. *Illinois* (1959), 359 U. S. 121, 151 (dissenting opinion). "Few principles have been more deeply 'rooted in the traditions and conscience of our people.'" *Id.* at 155. If double jeopardy is so basic a requirement of justice, it follows that "[i]t is just as much an affront to human dignity and just as dangerous to human freedom for a man to be punished twice for the same offense, once by a state and once by the United States, as it would be for one of these two governments to throw him in prison twice for the offense." *Abbate* v. *United States* (1959), 359 U. S. 187, 203 (dissenting opinion). For this court is not convinced "that a state and the nation can be considered two wholly separate sovereignties for the purpose of allowing them to do together what, generally, neither can do separately." *Ibid.* Accordingly, freed of the fetters of *stare decisis,* this court would unhesitatingly reject such arguments in the name of dual sovereignty and technical federalism as antithetical to our entire national purpose and to that very federalism to which they pay lip service. And it would do so resolutely whether its authority for so ruling rested upon the Double Jeopardy Clause of the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment, the Double Jeopardy Clause of the Constitution of this state, or any combination of such constitutional authorities.

But this is not an open question. *Bartkus* v. *Illinois,* on almost identical facts to those in issue here, reached a different conclusion, and must be dealt with.

Fortunately, however, the bare majority decision in *Bartkus* was neither so compellingly logical at the time it was written, nor has it stood so well the test of time in the scant nine years since it was decided as to require this

court's blind adherence to such a pernicious doctrine. For it is apparent that the flesh and muscle of both of *Bartkus'* supporting arguments have so withered away that the bare bones of the illogic of that decision stand exposed to the entire jurisprudential community, leaving that decision without contemporary relevance or persuasive force.

The first of *Bartkus'* supporting grounds, that neither the commands of the Double Jeopardy Clause of the Fifth Amendment nor the prohibitions of the balance of the first eight amendments are binding upon the states by authority of the Due Process Clause of the Fourteenth Amendment, seems, from a contemporary vantage point, quaint indeed.

For when Mr. Justice Frankfurter, speaking for the majority in *Bartkus*, denied "that the Fourteenth Amendment was a short-hand incorporation of the first eight amendments making them applicable as explicit restrictions upon the states," 359 U. S. 121, 124, he could not have anticipated, this court believes, the marked metamorphosis of constitutional philosophy which the majority decisions of that court would demonstrate almost as soon as the ink had dried on that decision.

Although a number of justices had earlier supported the view that the guarantees of the first eight amendments were necessary requirements of due process and therefore enforceable against the states by authority of the Fourteenth,[3] that constitutional construction had never commended itself to a majority of the court. See *Chicago, B. & Q. R. Co.* v. *Chicago* (1897), 166 U. S. 226. *In re Kemmler* (1890), 136 U. S. 436, 448-449; *Twining* v. *New Jersey* (1908), 211 U. S. 78; *Adamson* v. *California* (1947), 322 U. S. 46. Nor had a majority ever held that particular guarantees were safeguarded against state action by the Fourteenth Amendment. See *Weeks* v. *United States* (1914), 232 U. S. 383, 398; cf. *Wolf* v. *Colorado* (1949), 338 U. S. 25, 27-28 (Fourth Amendment); *Hurtado* v.

---

[3]Ten of the justices had at one time or another supported this view. See opinion of Mr. Justice Douglas in *Gideon* v. *Wainwright* (1963), 372 U. S. 335, 336.

*California* (1884), 110 U. S. 516, 538; *Palko* v. *Connecticut* (1937), 302 U. S. 319, 328 (Fifth Amendment); *Maxwell* v. *Dow* (1900), 176 U. S. 581, 595; *Betts* v. *Brady* (1942), 316 U. S. 455 (Sixth Amendment); *Walker* v. *Sauvinet* (1876), 92 U. S. 90, 92 (Seventh Amendment); *O'Neill* v. *Vermont* (1892), 144 U. S. 323, 332 (Eighth Amendment). With constitutional philosophy at this stage of development at the time *Bartkus* was decided, the devotion of five pages of text and nine pages of appendices in the majority opinion to support the majority's refusal to charge the states with enforcement of the double jeopardy provisions of the Fifth Amendment may, perhaps, be historically understood. Recognition of its continued vitality as constitutional doctrine is not so readily acceptable however, in the light of subsequent jurisprudential history.

For, without wholesale incorporation of all the provisions of the first eight amendments into the due process commands of the Fourteenth, the present court majority has, by a process of "selective incorporation" of many of the specific guarantees enumerated in the first eight amendments into the Fourteenth Amendment as prohibitions against the states, accomplished a similar result on a case-by-case basis. By re-examining and rejecting prior decisions and finding such rights "implicit in the concept of ordered liberty" and necessary "to maintain a fair and enlightened system of justice," *Palko* v. *Connecticut* (1937), 302 U. S. 319, 325, the court majority has specifically incorporated into the Fourteenth Amendment the exclusionary rule of the Fourth Amendment, *Mapp* v. *Ohio* (1961), 367 U. S. 643, the self-incrimination clause of the Fifth Amendment, *Malloy* v. *Hogan* (1964), 378 U. S. 1, the Sixth Amendment rights of effective assistance of counsel, *Gideon* v. *Wainwright* (1963), 372 U. S. 335, confrontation of adverse witnesses, *Pointer* v. *Texas* (1965), 380 U. S. 400, and speedy trial, *Klopfer* v. *North Carolina* (1967), 386 U. S. 213, and the cruel and unusual punishment provisions of the Eight Amendment, *Robinson* v. *California* (1962), 370 U. S. 660. That the Supreme Court has not yet specifically incorporated the double jeopardy clause of the Fifth

Amendment into the Fourteenth demonstrates no deliberate judicial intention to relegate that fundamental safeguard to some inferior status; rather, protection against double jeopardy has been so fiercely guarded as a basic element of our heritage of freedom and its history so closely parallels that of other basic values already embedded in our conception of due process,⁴ that this court is led ineluctably to the conclusion that its current omission from the Supreme Court's ever-lengthening recital of protections within our expending notions of fundamental fairness, is but temporary and indicates only that the judicial process of redefining constitutional philosophy, though in progress, is, as yet, incomplete.

At least two other inferior courts have come to a similar conclusion. *United States* v. *Wilkins* (1965), 348 F. 2d 844, 853-854; *People* v. *Eggleston* (Cal. App. 1967), 63 Cal. Reptr. 104.

Mr. Justice Marshall, writing for the Second Circuit in *Wilkins*, observed:

"It would be indeed difficult to maintain that the basic core of the double jeopardy guarantee is not as fundamental as some of [the] guarantees [already incorporated into the due process clause of the Fourteenth Amendment] and that therefore it should not be included in the universe of those guarantees of the Bill of Rights that are absorbed by the Fourteenth Amendment and made applicable to the states."

In *Eggleston*, the court noted:

"The premise that the Fourteenth Amendment makes the Fifth wholly applicable to the states has not been adopted by the United States Supreme Court * * * There are, however, indications in later decisions of that court of a trend to such a rule * * *We shall assume * * * that the double jeopardy proscription of the Fifth Amendment is fully applicable to the states."

The foregoing analysis of recent constitutional his-

---

⁴For a detailed examination of the historic struggle against exposure to double prosecution for a single offense, see Black, J., dissenting in *Bartkus* v. *Illinois* (1959), 359 U. S. 121, 150.

tory compels this court to conclude that the Fifth Amendment double jeopardy clause is essential to any meaningful view of due process of law and is therefore, by operation of the Fourteenth Amendment an explicit limitation, to precisely the same extent as that clause circumscribes federal governmental activity,[5] upon criminal administrative conduct in every state, including, of course, the state of Ohio.

We turn to the second stated basis for the *Bartkus* result, that the retention of the "dual sovereignty" philosophy of law enforcement is essential to the appropriate balance of federal-state relations. In *Bartkus,* the court majority expressed the fear that federal prosecution for minor offenses would preclude the states from imposing more harsh penalties for the same acts and thereby "the result would be a shocking and untoward deprivation of the historic right and obligation of the states to maintain peace and order within their confines." 359 U. S. 121, 137. Whatever the merits of such an argument when written,[6] several operative constitutional facts have emerged since *Bartkus* that make the philosophic view of federalism there expressed archaic, to say the least. *First,* the view of federalism espoused by the majority in *Bartkus* assumes a relentless antagonism and competition between the federal and state law enforcement authorities for the right to punish wrongdoers. "[I]t relies on the unwarranted assumption that state and nation will seek to subvert each other's laws." *Bartkus* v. *Illinois* (1959), 359 U. S. 121, 156 (dissenting opinion). In point of fact, nothing has been further from the truth. The cases are replete with examples of the entirely commendable practice of hand-in-glove co-operative efforts by state and federal authorities to investi-

---

[5]It is too late in the day to argue that states are bound by a less stringent standard of constitutional conduct than the federal government, for the United States Supreme Court "has rejected the notion that the Fourteenth Amendment applies to the states only a 'watered-down, subjective version of the individual guarantees of the Bill of Rights.'" *Malloy* v. *Hogan* (1964), 378 U. S. 1, 12.

[6]See the biting dissent by Black, J., in response to the majority argument in *Bartkus* (1959), 359 U. S. 121, 156-157.

gate crime, gather evidence and prosecute criminals. *E. g.,* *Rea* v. *United Sattes* (1956), 350 U. .S 214 (federal agent gathered evidence and sought to introduce it in a state prosecution); *Elkins* v. *United States* (1960), 364 U. S. 206 (state officers gathered evidence and sought to introduce it in a federal prosecution). See also *Lustig* v. *United States* (1949), 338 U. S. 74; *Byars* v. *United States* (1927), 273 U. S. 28; *Gambino* v. *United States* (1927), 275 U. S. 310. As pointed out by the court in *Murphy* v. *Waterfront Comm.* (1964), 378 U. S. 52, 55-57, this has indeed become the "age of 'co-operative federalism' where the federal and state governments are waging a united front against many types of criminal activity." And see Harlan, J.'s concurring opinion in which he acknowledges "the increasing interaction" and the "increasing, productive co-operation between federal and state authorities in the prevention of crime." *Id.* at 91-92. With such governmental co-operation,[7] it is apparent that the opportunities for "whipsawing" a defendant between two sovereignties have substantially increased, while a defendant's opportunity to escape his just punishment because of interference by one government in the affairs of another have correspondingly diminished. It may well be for this reason that in *Murphy* v. *Waterfront Commission* (1964), 378 U. S. 52, the court, in the words of two members of the *Bartkus* majority, "abolished the 'two sovereignties' rule." *Stevens* v. *Marks* (1966), 383 U. S. 234, 250. It is true that the demise of the "two sovereignties" rule occurred in *Murphy* in the context of consideration of the limits of the Fifth Amendment

---

[7]This court is not now faced with the very difficult problem of articulating broad double jeopardy rules which apply to criminal sanctions imposed in a highly charged political atmosphere in which state and federal interests in law enforcement may not necessarily coincide. E. g., *Brown* v. *Bd. of Education* (1954), 347 U. S. 483; *Griffin* v. *County School Bd.* (1964), 377 U. S. 218; and see cases implementing *Brown* collected in 2 Emerson, Haber & Dorsen, Political and Civil Rights in the United States 1629-30, 1634-35 (3d ed. 1967). While the result reached here today may be more or less compelling under such circumstances than those before this court, that question is not before us. For it can scarcely be denied that the interests of both state and federal authorities in bringing bank robbers to justice is identical.

privilege against self incrimination, not double jeopardy. But those who concurred on more narrow grounds, 378 U. S. 52, 80, 92, made the same arguments used to reach the *Bartkus* result to the *Murphy* majority. Such arguments were rejected.

*Second,* the focus of this discussion of dual sovereignty has thus far been centered upon the problems of law enforcement. It would not do to conclude it, however, without consideration of the plight of the accused under administrative attack by both state and federal law enforcement officers for a single offense. When the focus is upon the accused in such perilous circumstances, the patent injustice of the dual sovereignty concept as applied to double jeopardy considerations screams for relief. Even the *Bartkus* majority paused in its attempt to justify the double prosecution of the accussed by technical application of its version of federalism, to acknowledge, however slightly, the woeful resultant prejudice to the accused:

"The greatest self-restraint is necessary when that federal system yields results with which a court is in little sympathy." 359 U. S. 121, 138.

The evils of double prosecution, the excessive burdens such practice imposes upon the defense and the opportunities for prosecutorial harrassment available as a result of its judicial sanction have been set out in detail elsewhere. *Bartkus* v. *Illinois* (1959), 359 U. S. 121, 163-164 (dissenting opinion). And see Note, Double Prosecution by State and Federal Governments: Another Exercise in Federalism, 80 Harvard Law Review 1538, 1539-1540 (1967). Suffice it to say that these detrimental personal effects upon the accused have been given greater and greater weight by the courts in recent times in balancing the needs of law enforcement against the rights of the accused in the essentially unequal struggle of the individual against the massed force of government in the arena of the criminal courts. There can be no doubt that the constitutional limits placed upon state police in searching for evidence, *Mapp* v. *Ohio* (1961), 367 U. S. 643, interrogating witnesses in custody, *Miranda* v. *Arizona* (1966), 384 U. S. 436, or obtaining eye-

witness testimony at the identification lineup at the jail-house, *Gilbert* v. *California* (1967), 38 U. S. 263, have in-fringed upon the sovereignty traditionally exercised by state law enforcement authorities in ferreting out crime within their jurisdictions. But the United States Supreme Court has weighed such traditional state sovereignty against the fact that, in the name of federal principle, hordes of accused persons have been denied important rights guaranteed them by the United States Constitution. Time and time again, so that the pattern is quite clear, the protection of the rights of the accused has triumphed in that court's deliberations. This court cannot believe that any other result could be reached here.

Whether this affirmation of human rights over states' rights signals the end of the federal system has been hotly debated in recent times. This court is undismayed by this humanitarian trend. For the heart of federalism does not lie in the enforcement of a shallow, abstract and automatic line of demarcation between the state and federal sovereign-ties. Rather, it lies in the recognition of the fact that an individual is entitled to have his freedom protected by both the state in which he resides and the nation to which he pledges his allegiance, and in the understanding that when one sovereignty fails to provide him justice, he may look to the other for the relief which the constitution guar-antees him. When such a conception of federalism has been achieved, our constitutional promises will have been fulfilled and, perhaps surprisingly, our law enforcement system will be more effective, both individually and in co-operation with each other. It is this court's hope that this decision will bring that day a little closer.