THE STATE OF OHIO, APPELLANT, *v.* FLETCHER, APPELLEE.
THE STATE OF OHIO, APPELLANT, *v.* FLETCHER ET AL.,
APPELLEES.

[Cite as State v. Fletcher (1970), 22 Ohio App. 2d 83.]

(Nos. 29521 and 29522—Decided May 7, 1970.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr.
Dennis J. McGuire,* for appellant.
    *Mr. Harry S. Golland,* for appellee Michael Fletcher.
    *Mr. Gerald A. Messerman,* for appellee Willie Walker.

DAY, J. In this opinion, Ohio will be referred to as the
"State" and the respective defendants, Michael Fletcher
and Willie Walker, as "defendant Fletcher" and "defend-
ant Walker" except when the reference is to both. In the
latter reference, defendant Fletcher and defendant Walk-
er will be called collectively the "defendants."

I.

On February 2, 1967, defendant Fletcher was indicted
by the Cuyahoga County Grand Jury for rob-
bery of a financial institution, with a count for the unlawful
entry. A plea of former jeopardy and motion to quash the
indictment were filed by the defendant.

Also on February 2, 1967, defendant Fletcher and de-
fendant Walker were jointly indicted for robbery of a fi-
nancial institution, with a count for the unlawful entry.
Pleas of double jeopardy and motions to quash the indict-
ment were filed by both defendants.

The trial court considered the pleas well taken, and the

84

motions to quash each of the indictments were sustained with a supporting opinion.[1]

The State appeals in both instances, as it may, under the decision of the Supreme Court of Ohio in *Euclid* v. *Heaton* (1968), 15 Ohio St. 2d 65, 72, where Sections 2945.-67 to 2945.70, Revised Code, were held "constitutionally inoperative to permit an 'appeal' in a criminal case on behalf of the prosecutor from any judgment of a trial court *not included within the exceptions* enumerated in Section 2945.70, Revised Code." (Emphasis added.)

These appeals will lie because the enumerated exceptions include "a motion to quash."

The appeals were argued together and, because of common issues, are considered together and decided together. We affirm.

## II.

The State indictments rest on the same claimed criminal acts which supported charges pressed to a conclusion against the present defendants in the federal jurisdiction for the Northern District of Ohio. Each defendant acquired his status as an Ohio defendant solely because his actions took place where two levels of government were operative, *i. e.*, federal and state. Neither defendant has been tried on the merits in the Ohio system. A description of the federal proceedings follows.

On January 27, 1967, in *United States* v. *Michael Fletcher*, defendant Fletcher was charged by information on two counts for violations of Title 18, Section 2113(a) and (c), U. S. Code. In essence, the two counts charged (1) the armed robbery of a savings and loan association whose deposits were insured by the Federal Savings and Loan Insurance Corporation,[2] and (2) the receipt and conceal-

[1]*State* v. *Fletcher* (1968), 15 Ohio Misc. 336. Wherever the phrases "double jeopardy" or "successive prosecutions" are used, they are assumed to mean one prosecution followed by another, both flowing from the same act, with the essential difference between the two proceedings being the "sovereignty," *i. e.*, state or federal, under whose auspice the charge is laid.

[2]The date of the charged robbery was December 16, 1966, and the association was Superior Savings & Loan Association, 6712 Superior Avenue, Cleveland, Ohio.

ment of money stolen from a bank whose deposits were insured by the Federal Deposit Insurance Corporation.[3] Defendant Fletcher plead guilty to the federal counts on January 26, 1967, and was sentenced to fifteen years on the first count and ten years on the second—the sentences to run concurrently.

On February 8, 1967, in *United States* v *Willie Walker*, defendant Walker was charged by the indictment of a federal grand jury with the violation of Title 18, Section 2113(a), U. S. Code. In fine, the charge was armed robbery of a bank whose deposits were insured by the Federal Deposit Insurance Corporation.[4] Defendant Walker was found not guilty and an order dismissing the indictment against him was entered on May 1, 1967.

### III.

The stance of the facts raises the question of double jeopardy in three aspects—where there have been federal prosecutions resulting in acquittals, convictions or pleas of guilty:[5]

1. Does the double jeopardy clause in the Fifth Amendment to the United States Constitution, which inhibits successive prosecutions in the federal jurisdiction for the same act, apply to the states through the Due Process clause of the Fourteenth Amendment?

2. If 1. is answered "Yes," does the prohibition

---

[3] The receipt and concealment charge involved funds alleged to have been robbed on January 10, 1967, from the Union Commerce Bank, 2800 Euclid Avenue, Cleveland, Ohio.

[4] The date of the charged robbery was January 10, 1967, and the bank was the Union Commerce Bank, 2800 Euclid Avenue, Cleveland, Ohio.

[5] For the purpose of the issues in this case, whether a federal defendant is acquitted or convicted is without relevance. The relevant factor is that a defendant has been put in "jeopardy" in federal court. *United States* v. *Ball* (1896), 163 U. S. 662, 669-671, 41 L. Ed. 300, 302-303. It may be an obvious point, but we note also that whether a defendant plead guilty or was found guilty does not affect the issues in the *Fletcher* case. Having plead guilty in federal court, defendant Fletcher would have special problems in a second trial in a state court. Would his federal plea be admissible? What is the effect of Rule 11, Federal Rules of Criminal Procedure, as amended, requiring the court not to enter judgment upon a plea of guilty unless "satisfied that there is a factual basis for the plea"?

against state action block successive prosecutions in the *state* jurisdiction?

3. Apart from impediments in the United States Constitution, does Section 10, Article I of the Ohio Constitution prohibit second state prosecutions in Ohio for the claimed criminal acts which induced the prior prosecutions in the federal jurisdiction?

## IV.

There is a deceptive simplicity about the general proposition that no man shall be twice in jeopardy in a criminal case. Therefore, to circumscribe that deception we confine ourselves to the questions formulated earlier in this opinion. This limitation avoids some very difficult problems which, if not central to the successive prosecution issue, are so related to it as to warrant a clear disclaimer. We do disclaim any intimation of opinion with respect to such problems as multiple prosecutions where there are multiple victims of a single criminal act,[6] or multiple crimes flowing from an act affecting a single victim,[7] or splitting causes or collateral estoppel, or when jeopardy has attached to prevent retrial following discharge of a jury or any

---

[6]See *Hoag* v. *New Jersey* (1958), 356 U. S. 464, 2 L. Ed. 2d 913, where one holdup involving five victims resulted in three separate indictments for robbery and three acquittals. On a subsequent indictment for the robbery of a fourth person during the same incident the defendant was convicted. A majority of the court upheld the conviction against a claim of double jeopardy. In *Ciucci* v. *Illinois* (1958), 356 U. S. 571, 2 L. Ed. 2d 983, the petitioner was charged in four separate indictments with murdering his wife and three children, apparently at the same time. In separate consecutive trials he was found guilty. In the first two the penalty was assessed by the jury at 20 and 45 years imprisonment, respectively. After the third conviction the sentence was death. The majority in the Supreme Court of the United States found no proof of fundamental unfairness sufficient to violate due process. See, however, *Ashe* v. *Swenson* (U. S. S. Ct., 4/6/70), 38 L. W. 4295, incorporating the doctrine of collateral estoppel into the concept of double jeopardy and throwing the continued vitality of *Hoag* and *Ciucci* in grave doubt if not overruling them *sub silentio*.

[7]*P. e.* Two counts of murder, one for killing purposely and with deliberate and premeditated malice under Section 2901.01, Revised Code, and another, under Section 2901.04, Revised Code, because the same victim was a law officer engaged in the discharge of his duties.

other issues not encompassed in the questions stated in III. Such problems may generate constitutional questions of due process quite apart from, or interwined with, double jeopardy,[8] depending on the factual situation. In any event, those questions are not before us now for decision.

Confining our rule to those successive prosecutions whose succession would not be but for the circumstance of federalism in our scheme of government, we avoid deciding what is not before us and at the same time essay decision on a problem much more manageable because restricted in scope.

## V.

The first question posed in III has been answered recently by the Supreme Court of the United States and is no longer in doubt. The double jeopardy stricture of the Fifth Amendment does apply to the states through the providence of the Due Process clause of the Fourteenth Amendment.[9] *Benton* v. *Maryland* (1969), 395 U. S. 784, 23 L. Ed. 2d 707.

Since the *Benton case* reversed a conviction for larceny on a second trial following an earlier acquittal in the same state, it does not reach the question whether the federal proscription against double jeopardy prevents a state prosecution following a federal acquittal or conviction where the only distinction of consequence between the two prosecutions is the source of the prosecuting initiative. Nonetheless, *Benton* casts a long shadow that makes it necessary to say that the resolution of the second question is in little doubt. That conclusion is supported in part by an analysis of two cases—*Bartkus* v. *Illinois* (1959), 359 U. S.

[8]For a review of the several aspects of the double jeopardy problem and its relative, multiple punishment, see L. G. Miller, *Double Jeopardy and the Federal System*, 4-9, University of Chicago Press 1968; see, also, the general summation of problems in M. L. Friedland, *Double Jeopardy*, 16-17, Clarendon Press, Oxford, 1969. The range of complexities and difficulties inherent in the application of the double jeopardy concept indicates the necessity for considerable judicial "line drawing" in appropriate cases.

[9]Thus fulfilling the prophecy of the trial court in the present cases. See *State* v. *Fletcher, supra*, at 342-343.

121, 3 L. Ed. 2d 684, and *Abbate* v. *United States* (1959), 359 U. S. 187, 3 L. Ed. 2d 729, and in a larger proportion by the inferences to be drawn from *Benton* itself.

Before *Benton*, a strong, although not necessarily conclusive,[10] case could be made for the proposition that *Bartkus* v. *Illinois, id.*, held definitively that an acquittal on a federal charge did not foreclose an indictment and conviction for the same acts in a state jurisdiction.

In *Bartkus*, the petitioner was first acquitted on a bank robbery charge in the United States District Court for the Northern District of Illinois and then convicted under the Illinois robbery statute on an indictment reciting facts substantially identical to the facts in the prior federal indictment.

The Supreme Court of the United States, invoking an elaborate history to support the proposition that the federal bill of rights was not intended to apply to the states through a shorthand labeled "Due Process," *Bartkus* v. *Illinois, supra* (359 U. S. at 124-136, 3 L. Ed. 2d at 687-694),[11] sustained the state conviction but paid its respects to the "double sovereignty" issue[12] by noting that the same his-

---

[10]See the persuasive pre- *Benton* case *against* continuing vitality for *Bartkus* and the "double sovereignty" concept as a justification for successive prosecutions described by the trial court in this case. *State* v. *Fletcher, supra*, pp. 344-347.

[11]Three specific rights within the first eight Amendments were used to demonstrate the "no shorthand" point by showing contradiction or indifference to the same rights in the constitutions of ratifying states. The rights chosen for the demonstration were (1) the grand jury guarantee, (2) the criminal jury guarantee, and (3) the civil jury guarantee of the Fifth, Sixth and Seventh Amendments to the United States Constitution, respectively. However, Mr. Justice Black, in his dissent, points out that all but five states recognize the double jeopardy principle in their constitutions and each of those five effects the same prohibition as part of the common law. *Id.* fn. 9, Black, J., dissent.

[12]In 1964, the court, in effect, abolished the double sovereignty concept as applied to the problem of self-incrimination. See *Murphy* v. *Waterfront Commission of New York Harbor* (1964), 378 U. S. 52, 12 L. Ed. 2d 678; cf. *Malloy* v. *Hogan* (1964), 378 U. S. 1, 12 L. Ed. 2d 653. Clark, Harlan and Stewart, JJ., of the *Bartkus* majority concurred in *Murphy* for a variety of reasons. By early 1966, however, Harlan and Stewart, JJ., were declaring that the *Murphy case* had "abolished the 'two sovereignties' rule." *Stevens* v. *Marks* (1966),

tory, reflected and confirmed in judicial precedent, revealed that the widely followed practice was to allow second prosecutions ''even though there had been a prior trial by another government.''[13] The majority declined to interpose the Due Process clause of the Fourteenth Amendment to bar a second prosecution in ''disregard of a long, unbroken, unquestioned course of impressive adjudication''[14] and assigned an additional ''practical justification'' in support of the declination. The justification was that a rule refusing to bar a second prosecution would prevent displacement of the states' reserve power to act, thus preventing federal action involving a relatively minor penalty from blocking

---

383 U. S. 234, 250, 15 L. Ed. 2d 724, 735. No doubt this declaration must be read in the light of the self-incrimination issue, but it is an indicator of the direction the supreme judicial winds are blowing.

[13]*Bartkus* v. *Illinois, supra* (359 U. S.), at 136, 3 L. Ed. 2d at 694.

Frankfurter, J., noted for the majority that 27 of 28 states that had considered the matter denied the bar for a second prosecution after a first prosecution in a different jurisdiction, *Bartkus* v. *Illinois, supra,* fn. 24, but that the American Law Institute Model Penal Code listed some 15 states with statutes barring second prosecutions if the defendant has been tried by another government for a similar offense, *id.,* fn. 27. The language of such statutes is not always the same. See Appendix A.

[14]*Bartkus* v. *Illinois, id.* at 136, 3 L. Ed. 2d at 694. According to scholarly commentators, the English rule, contrary to the court's view, seems to be well settled, at least against permitting second prosecutions after acquittals *merely* because the second effort began under the auspices of a different territorial sovereignty. See Friedland, *supra,* 12, 364. And cf. Grant, *Successive Prosecutions by State and Nation: Common Law and British Empire Comparisons,* 4 U. C. L. A. Law Rev., 1, 8, 34 (1956):

"The common law doctrine * * * had been * * * settled by three clearcut decisions rendered prior to the American revolution.
''* * *

"One searches the British Empire in vain for the 'dual sovereignty' theory of successive prosecutions, whether at the international, the inter-dominion, or the dominion-province or commonwealth-state levels."

Reliance on *United States* v. *Lanza* (1922), 260 U. S. 377, 67 L. Ed. 314, by the *Bartkus* majority only accentuates doubts about the precedential foundations for the *Bartkus* decision. For, although *Lanza* supports dual sovereignty, successive prosecutions, it relies in turn on the *dicta* in some of eleven Supreme Court precedents, in none of which is the dual sovereignty successive prosecution doctrine essential to decision, see Appendix B.

state action to prosecute a much more serious offense rising from the same facts.[15]

The "no bar" conclusion in *Bartkus,* Mr. Justice Frankfurter said, was supported alike by "[P]recedent, experience and reason."[16]

---

[15]Using *Screws* v. *United States* (1945), 325 U. S. 91, 89 L. Ed. 1495, as an example, the majority pointed out that the federal prosecutions in that case resulted in convictions with one and two year penalties for a crime which was a capital offense under state law. A Georgia sheriff, a special deputy and a policeman beat to death a young negro as he alighted from the car which took him to the courthouse. He was charged with stealing a tire. The beating, administered by using a solid bar blackjack and fists, continued for fifteen to thirty minutes after the decedent was knocked to the ground still handcuffed. The claimed provocation was decedent's reach for a gun and insulting language. *Id.* at 92-94, 89 L. Ed. at 1497-1498. The *Screws case* reversed and (impliedly) remanded for a new trial for the trial court's failure to properly instruct the jury on the question of intent. Construing "willfully" in Section 20 of the Federal Criminal Code (Title 18 U. S. Code, Sec. 52) as tantamount to "specific intent," the court saved the section from a charge of unconstitutionality for vagueness. *Id.* at 100-107, 89 L. Ed. at 1502-1506. Consistently with his thesis in *Bartkus,* Mr. Justice Frankfurter, dissenting in *Screws,* maintained, among other things, that the practical consequence of the latter decision was the *relaxation* of state responsibility for homicide "by allowing prosecutions in the federal courts for a relatively minor offense carrying a short sentence," *id.* at 139, 89 L. Ed. at 1523. The dissent does not contend that a federal conviction in *Screws* would prevent a state prosecution, for the very good reason that the law would not support such a conclusion *at the time* that case was decided. That Georgia was "lax" in enforcement may be inferred only from the single reference in the dissent to the actual posture of state enforcement. This reference indicates that the Solicitor General of the Albany Circuit for the State of Georgia testified in the federal trial that no complaint had been filed in connection with the prisoner's death. *Id.* at 160, 89 L. Ed. at 1534. One may doubt that the federal prosecution was responsible for this omission or that simple "laxness" explains it.

[16]*Bartkus* v. *Illinois, supra* (359 U. S.), at 139, 3 L. Ed. 2d at 695. Cf. J. A. C. Grant (writing in 1956 before *Bartkus*) who analyzed our own, common-law and British Empire actions in successive, dual sovereignty prosecutions and derived quite a different conclusion about the United States experience. His judgment is indicated by his concluding inquiries: "Have we gained a Constitution, but lost the spirit of the common law? Have we substituted artificial reasoning and

Whatever the uses of history, they provide neither a mechanistic nor universal standard for the application of law. Least of all do they provide an excuse for ignoring the implications of a recent instruction from the highest court in the land. In deciding *Benton* v. *Maryland, supra,* Mr. Justice Marshall said, for the majority, that the prohibition against double jeopardy in the Fifth Amendment applied to the states through the Due Process clause of the Fourteenth Amendment. It was, he declared, "Like the right to trial by Jury * * * clearly 'fundamental to the American scheme of justice.' "[17] Double jeopardy could hardly have been characterized otherwise. For if the right to counsel, *Gideon* v. *Wainwright* (1963), 372 U. S. 335, 9 L. Ed. 2d 799, and self-incrimination, *Malloy* v. *Hogan* (1964), 378 U. S. 1, 12 L. Ed. 2d 653, *Murphy* v. *Water Front Commission of New York Harbor* (1964), 378 U. S. 52, 12 L. Ed. 2d 678, are examples of fundamentals, *a fortiori* double jeopardy is. Moreover, the *Benton* majority noted a recent tendency of the Court, crucial here, " 'increasingly * * * [to look] to the specific guarantees of the [Bill of Rights] to determine whether a state criminal trial was conducted with due process of law.' " 395 U. S. at 794, 23 L. Ed 2d at 715.

With this teaching in hand, and recognizing the degree of reliance in *Bartkus* on precedents and concepts now weakened, if not repudiated, we conclude that the rule of *Bartkus* is so enfeebled[18] as to lack all binding force.

mechanical jurisprudence for basic rights?" *Successive Prosecutions by State and Nation: Common Law and British Empire Comparisons, supra* 37.

[17]*Benton* v. *Maryland* (1969), 395 U. S. 784, 796, 23 L. Ed. 2d 707, 717.

[18]*P. e., Bartkus* leaned heavily on *Palko* v. *Connecticut* (1937), 302 U. S. 319, 82 L. Ed. 288, which *Benton* specifically overruled "insofar as * * * inconsistent with this holding." Moreover, the *Benton* court said of *Palko*, 395 U. S. at 796, 23 L. Ed. 2d at 717:

"The validity of [the] * * * conviction must be judged not by the *watered-down standard enunciated in Palko,* but under this Court's interpretations of the Fifth Amendment double jeopardy provision." (Emphasis added.)

Whether the *Benton* principle is retroactive is not a factor of

The effects are several. *Bartkus* and cases of the same genus may be eliminated from further consideration. Therefore, whatever support by projection or analogy *Bartkus* lent *Abbate* is gone.

However, the present cases involve second jeopardies in a state jurisdiction after (1) federal acquittal and (2) a federal plea of guilty. And the *Benton* rule, limited by the facts of that case (successive prosecutions in the same state jurisdiction), reaches only by implication the issue of prior jeopardy in one jurisdiction as a bar to a later prosecution in a second jurisdiction. Nonetheless, that implication clouds *Abbate* v. *United States* (1959), 359 U. S. 187, 3 L. Ed. 2d 729, which, before *Benton,* might have been thought dispositive, by analogy, of the dual sovereignty-successive jeopardy issue because it held that an Illinois conviction did not bar further prosecution and conviction on federal charges growing out of the same acts. But, *Abbate,* even without *Benton,* is susceptible to the interpretation that in it the Supreme Court was merely fashioning a rule to protect the jurisdiction of the federal courts, thus exposing a concern[19] which reveals the obverse side of that sensitivity to federal-state relationships which found expression in Mr. Justice Frankfurter's feeling for states' rights in *Bartkus.* In this view, the *Abbate* response represents only the Court's reaction to its supervisory responsibility for the federal court system. See *Rea* v. *United States* (1956), 350 U. S. 214, 216-217, 100 L. Ed. 233, 236-237. Certainly, the principle of *Abbate* mounts no constitutional mandate binding state courts *not* to treat a prior federal jeopardy as a bar to subsequent criminal proceedings by the states. Indeed, a close reading of both *Abbate* and *Benton* shows state courts to be unin-

significance in the cases now before this court because neither case has been tried on the merits in Ohio and because of our view of the constitutional posture of double jeopardy.

However, *Benton* was accorded a fully retroactive effect in *North Carolina* v. *Pearce* (1969), 395 U. S. 711; see fn. 1 in the majority opinion in *Ashe* v. *Swenson* (U. S. S. Ct. 4/6/70), 38 L. W. 4295.

[19]See *Abbate* v. *United States* (1959), 359 U. S. at 195, 3 L. Ed. 2d at 734-735.

structed on the issue except by projection from *Benton.* While the idea that the prohibition against double jeopardy is " 'fundamental to the American scheme of justice' " hardly presages a narrow future view of the constitutional scope of the double jeopardy clause, it is less than an explicit directive.

Were we required to estimate the implications of *Benton* for the future, our estimate would be that the Supreme Court of the United States will eventually hold it constitutionally requisite that state courts find prior federal jeopardy a bar to state prosecutions for the same act. Without extensive analysis, we note that every justification advanced in *Benton* to support the ending of "state on state" jeopardy applies with equal force to successive jeopardies where the singular distinction between the causes stems from the jurisdiction in which the first action is begun.

Only the "dual sovereignty" idea, an abstraction,[20] can be advanced to excuse federal after state or state after federal prosecutions. If it be thought that sovereignty insulates and protects successive prosecutions, it is most significant that an extinction of part of state sovereignty (the incorporation of the federal double jeopardy clause into strictures against state action imposed by Due Process under the Fourteenth Amendment) was utilized in *Benton* to accomplish the result in that case. In addition, it is of the utmost relevance to a forecast of future constitutional development that, although *Benton* did not overrule *Bartkus* specifically, it did overrule *Palko,* a major underpinning of *Bartkus,* to the extent inconsistent with the *Benton* rule. (See footnote 18, *supra.*)

No doubt there are values in the offsetting of powers and the decentralization of government, which double so-

---

[20] Cf. "Shall we fritter away our liberties upon a metaphysical subtlety, two sovereignties?" Grant, *"The Lanza Rule of Successive Prosecutions,"* 32 Col. Law. Rev. 1309, 1331 (1932). See, also, Story, J., dissenting in *Houston* v. *Moore* (1820), 18 U. S. (5 Wheat.) 1, 64, 5 L. Ed. 19, 34:

"* * * We do not sit here to fritter away the constitution upon metaphysical subtleties."

vereignty effects. But we are considering sovereignty in the *United* States and not the *Balkan* states.[21] And it is more than doubtful that the Supreme Court of this united country will hold, or should hold, that one of the blessings of freedom insured by the balancing of state and federal power is a permissible form of double jeopardy protected by federalism. Cf. Frankfurter, J., in *Bartkus, id.* at 137, 3 L. Ed. 2d at 695:

"" * * * the men who wrote the Constitution * * * were fearful of the power of centralized government and sought to limit its power.""[22]

A definitive conclusion, however, must await the case which puts the double jeopardy question as defined by the present facts squarely before the Supreme Court of the United States. Meanwhile, we are faced with the necessity for deciding this case.

From what has been said it is apparent that *Abbate* and *Bartkus* leave this court unrestrained in the application of the Due Process clause of the Fourteenth Amendment. Under the command of that clause, and the compulsion of our duty to uphold the United States Constitution, we conclude that it is incompatible with fundamental justice that a person who has been charged with crime be exposed to jeopardy for the same act first in the federal system and then a second time in the courts of this state. This is so whether "Due Process" in the Fourteenth Amendment encompasses the double jeopardy provisions of the Fifth Amendment or not. For the double menace from the single act is "repugnant to the conscience of man-

---

[21]See Mr. Chief Justice Taney in *Bank of Augusta* v. *Earle* (1839), 38 U. S. (13 Pet.) 519, 590, 10 L. Ed. 274, 309:

"* * * The intimate union of these states, as members of the same great political family; * * * should lead us * * * to presume a greater degree of comity, and friendship, and kindness towards one another, than we should be authorized to presume between foreign nations. * * *"

[22]But see Neumann, *Freedom and Federalism: A Critique* in *"Federalism Mature and Emergent,"* Ed. A. M. MacMahon 52-53 (Doubleday & Co. 1955), for a critical view of the proposition that federalism maximizes political freedom by counterbalancing powers or curbing the evil potential inherent in power.

kind.''[23] See *Palko* v. *Connecticut, supra,* at 323. Surely, if that fairness, which is the essence of due process, is to be more than an unfounded hope, one of its ingredients must be the assurance that one charged with crime hazards liberty or life but once for the same misconduct.

A justification for a quickened conscience on this question came on review of a second prosecution *after an acquittal* in *United States* v. *Green* (1957), 355 U. S. 184, 187-188, 2 L. Ed. 2d 199, 204. The reasons can hardly be stated better:

"'* * * the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and com-

---

[23]The probability is that a conscience on double jeopardy began to develop at a very early time. A recent volume notes that the principle was not unknown to the Greeks and Romans and that the Digest of Justinian contained the precept that "the governor should not permit the same person to be again accused of a crime of which he had been acquitted." J. Sigler, *Double Jeopardy,* Cornell Univ. Press, Ithaca, N. Y. (1969), at p. 2. See Black, J., dissenting in *Bartkus* v. *Illinois,* 359 U. S. at pp. 151-155, 3 L. Ed. at 706-707. Some students of the problem suggest that a stricture against double jeopardy may be exemplified in the Old Testament by I Nahum 9:

"He will make a full end; He will not take
vengeance twice on his foes." (Revised Standard Version, 1952.)

In context the quotation bears the interpretation that after one round of the Lord's vengeance there is nothing left for a second. This fits more easily than does a conclusion of heavenly sensitivity to the legal problem involved in double jeopardy. The current state of conscience on this subject is reflected in the fact that by 1961 all but five states had double jeopardy prohibitions in their constitutions. See the list in *Note, Double Jeopardy and the Problem of Successive Prosecutions: A Suggested Solution,* 34 So. Cal. Law Rev. 252, 253 (1961) (the remaining five have common-law inhibitions. *Bartkus* v. *Illinois, id.* fn. 9), and by the number of states which have taken legislative action to bar "dual sovereigney" double jeopardy. See fn. 13, *supra,* and Appendix A. In mid-nineteenth century, dissenting in *Fox* v. *Ohio* (1847), 46 U. S. (5 How.) 410, 440, 12 L. Ed. 213, 226, Mr. Justice McLean said:

"* * * Nothing can be more repugnant * * * than two punishments for the same act. * * *"

Apparently every jurisdiction within the United States is in accord in one degree or another.

pelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.''

The rationale of the *Green case* does not lose power *after a conviction.*[24]

The imperatives of Due Process placed upon us by the Fourteenth Amendment to the United States Constitution require that the second question in III be answered ''Yes'' and that the judgment of the trial court be affirmed.[25]

## VI.

There remains the question whether, apart from federal constitutional issues, Section 10, Article I of the Ohio

---

[24]On the rationale against double jeopardy, see M. L. Friedland, *Double Jeopardy*, 3-5, Oxford University Press, London (1969). See also, Sigler, *ibid*, Chap. 5, *The Policy Issue: The Power of the Prosecutor*; and cf. Pontikes, *Dual Sovereignty and Double Jeopardy: A Critique of Bartkus* v. *Illinois and Abbate* v. *United States*, 14 Western Res. Law Rev. 700, 713 (1963), to the effect that multiple punishments consequent upon multiple prosecutions may threaten the standardization implicit in the rule of law and, therefore, the rule of law itself. For another aspect, cf. *United States* v. *Oppenheimer* (1916), 242 U. S. 85, 87, 61 L. Ed. 161, 164, where the full court affirmed the quashing of a second criminal indictment on a charge previously held to be barred by the statute of limitations. Refusing to confine *res judicata* in criminal cases to that more narrow area occupied by the Fifth Amendment provision against double jeopardy, Mr. Justice Holmes, speaking for the Court, said:

''* * * It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt. * * *''

Whether the second jeopardy follows an acquittal, a plea of guilty or a conviction makes little or no legal difference to the rationale against it. The sweeping language in the *Green case, supra,* is not confined to second prosecutions after an acquittal. It is only a literal reading of the facts which narrows the sweep. Moreover, a second state prosecution under any of the three circumstances may raise serious Eighth Amendment considerations. For the prohibition against cruel and unusual punishment is now applicable to the states through the Fourteenth Amendment. See, *Robinson* v. *California* (1962), 370 U. S. 660, 8 L. Ed. 2d 758.

[25]*Contra* is *State* v. *Cooper* (1969), 54 N. J. 330, 255 A. 2d 232, 235-236, decided one week after *Benton* v. *Maryland, supra,* but without reference to the latter decision. The Supreme Court of New Jersey relied heavily on *Bartkus* and *Abbate*. For the reasons assigned in the text, we do not consider the latter two decisions controlling.

Constitution prohibits the state prosecutions now before this court because of prior jeopardies incurred in the United States District Court for the Northern District of Ohio for the same acts.[20] For all practical purposes, this is a case of first impression in Ohio.

It is true that in *Koch* v. *State* (1895), 53 Ohio St. 433, the Supreme Court of Ohio affirmed a lower court which had sustained a demurrer to a plea in bar entered to an Ohio prosecution instituted under a statute for the "same act" which supported a previous conviction in the Akron Mayor's court. But that decision involved no analysis of the problem. The total opinion was but eleven lines long and the decisional portion but one sentence. In any event, the case did not involve dual sovereignty and preceded *Benton* v. *Maryland, supra,* by approximately 75 years. While principles do not necessarily degenerate with age, it seems more than probable that *Koch* would not survive in the judicial climate which produced *Benton,* nor even that which produced *State* v. *Shimman* (1930), 122 Ohio St. 522.*

In *Shimman,* the Supreme Court of Ohio indicated approval of the proposition "that prosecution and punishment under one sovereignty does not place the defendant in double jeopardy when prosecuted in the other" (*id.* at 525). This idea was carried into the first paragraph of the syllabus. However, the court said in a later case:

"The syllabus of a decision of the Supreme Court of Ohio states the law of Ohio, but such pronouncement must be interpreted with reference to the facts upon which it is predicated and the questions presented to and considered by the Court." *Williamson Heater Co.* v. *Radich* (1934) 128 Ohio St. 124, paragraph one of the syllabus.

---

[20] Section 2943.09, Revised Code, does not reach the question of successive prosecutions by different sovereignties.

*Since the original draft of this opinion, the doctrine of the *Koch* case has been swept away by the rationale of *Waller* v. *Florida* (U. S. S. Ct. 4/6/70), 38 L. W. 4263, 4266, which held it error to conclude:

"'* * * even if a person has been tried in a municipal court for the identical offense with which he is charged in a state court, this would not be a bar to the prosecution of such a person in the proper state court.'"

In the light of the *Shimman* syllabus, it is significant that in the text of the unanimous opinion in *Radich* the court said, at 126:

"* * * It [the syllabus] cannot be construed as being any broader than [the] * * * facts warrant. When *obiter* creeps into a syllabus it must be so recognized and so considered. * * *" (Emphasis added.)

The facts in *Shimman* reveal that *obiter* did creep in. For that case involved successive prosecutions in separate Ohio counties for violations arising out of the transportation of liquor in one continuous, uninterrupted transaction from Huron County into Sandusky County, all within the state of Ohio. On this state of the facts, the majority in *Shimman* found a plea in bar well taken on the ground that a single transaction was involved in the continuous transport, and that a second prosecution would place the defendant twice in jeopardy.[27]

Thus, it is apparent that the case did not involve two sovereignties and did not reach the issue now before this court and is not, therefore, a binding precedent on that issue. Beyond this, the constitutional development of the past four decades in the United States is of such dimension that it cannot be assumed that the *dictum* in *Shimman* provides an accurate guage of the present view of the Supreme Court of Ohio on the law of double jeopardy. It follows that the issue presently before us falls in virtually uncharted Ohio territory.

This does not mean that there are no benchmarks. The Ohio Constitution provides them. To hold that Ohio will allow prosecutions here after a federal jeopardy for the identical acts is to embrace a system of constitutional duality which enables the state to pursue, indeed to hound, a man who either has been found innocent or paid in the coin of another sovereignty for his dereliction.

To harass the innocent, the acquitted, or the guilty who have paid for their miscreance, is not compatible with constitutionally legitimate state action. For on the face of

---

[27] Marshall, C. J., joined by Day and Kincade, JJ., dissented.

it, it is at just such harassment that the injunction of Section 10, Article I of the Ohio Constitution is aimed:

"No person shall be twice put in jeopardy for the same offense."

That simple, broad, unqualified statement sets out the constitutional policy of Ohio on the issue. The evils that policy was meant to proscribe are not improved because the state and federal sovereignties combine to generate them. It would be incongruous to allow a basic constitutional policy of a state, determined as an aspect of its sovereignty, to be frustrated by a consequence of the duality which allows that sovereignty to exist.[28] Furthermore, it would be both inconsistent and ironic to use that federalism, which is justified in the name of protecting freedom, to obliterate a fundamental right.

No interest of the state remains unvindicated after one fair test of guilt. The development of federal constitutional law may eventually impose upon the states[29] the rule we now apply. Whether this development eventually takes place or not, the time has come to plainly say on behalf of Ohio, as the Supreme Court of Ohio said in a civil matter:

"A decided cause is worth as much as it weighs in reason and righteousness, and no more. It is not enough to say 'thus saith the court.' It must prove its right to control in any given situation by the degree in which it supports the rights of a party violated and serves the cause

---

[28]We deem state sovereignty in matters affecting a defendant's rights under the criminal law to mean at least this—local law may not reduce a right protected by the federal Constitution but may enlarge upon it.

[29]*Malloy* v. *Hogan* (1964), 378 U. S. 1, 11, 12 L. Ed. 2d 653, 661, may have forecast developments in dual-sovereignty double jeopardy when it said on the question of dual standards posed by the double sovereignty concept as applied to the Fifth Amendment privilege against self-incrimination:

"* * * It would be incongruous to have different standards determine the validity of a claim of privilege based on the same feared prosecution, depending on whether the claim was asserted in the state or federal court. Therefore, the same standards must determine whether an accused's silence in either a federal or a state proceeding is justified."

of justice as to all parties concerned." *Adams Express Co.* v. *Beckwith* (1919), 100 Ohio St. 348, at 352.[30]

There is no "reason" or "righteousness" and the cause of justice is not served in the second pursuit of one who has endured one jeopardy for the same act[31] in the federal jurisdiction. This becomes especially clear when it is considered that to hold otherwise is to require these defendants to either prove twice or pay twice to expiate the same offenses for the sole reason that the acts complained of took place where two layers of government fortuitously coincide. Therefore, the third question in III must be answered affirmatively.

We add the reasons under this section to those in V for affirming the judgment of the trial court.[32] The judgment below is affirmed.

*Judgment affirmed.*

WHITE, C. J., and WASSERMAN. J., concur.

---

[30]Cf. "When it appears that a challenged doctrine has been uncritically accepted as a matter of course by the inertia of repetition—has just 'grow'd' like Topsy—the Court owes it to the demands of reason, on which judicial lawmaking power ultimately rests for its authority, to examine its foundations and validity in order appropriately to assess claims for its extension." Frankfurter, J., dissenting in *Mitchell* v. *Trawler Racer, Inc.* (1960), 362 U. S. 539, 551, 4 L. Ed. 2d 941, 949.

[31]The difficulties of the "same evidence" test for double jeopardy, cf. Friedland, *supra*, 97-101, have been avoided here for the obvious reason that the federal and state proceedings involved have no difference not directly dependent on dual sovereignty. See, also, Friedland's discussion of the "in peril" test, *id.* 101-169, and the *Blockberger* rule, *id.* 109-110. See footnote 1, *supra*. Cf. Mr. Justice Brennan, joined by Douglas and Marshall, JJ., concurring in *Ashe* v. *Swenson, supra*, 4299 *et seq.*

[32]In view of the history and practice of co-operation between state and federal law enforcement officials, the proscription of successive prosecutions does not augur either destructive competition between the respective governmental entities or lax enforcement efforts on the part of either. See case examples cited in the opinion of the trial court in this case, *State* v. *Fletcher, supra*, at 344-345. The federal government can always protect itself by resort to pre-emption. See *Pennsylvania* v. *Nelson* (1956), 350 U. S. 497, 100 L. Ed. 640; *Southern Ry.* v. *Railroad Commissioner* (1915), 236 U. S. 439, 59 L. Ed. 661; and cf. H. M. Hart & H. Wechsler, *The Federal Courts and the Federal System*, the Foundation Press, Inc. (1953), especially Chap. IV, Section 2, *Federal Authority and State Court Jurisdiction.*

APPENDIX "A"

"Dual-Sovereignty Successive Prosecutions—Policy Reflected in State and Federal Statutes and Department of Justice Practice."

At least 3 states have enactments with identical wording:

"Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of another *state, government,* or *country,* founded upon the act or omission in respect to which he is on trial, he has been acquitted or convicted, it is a sufficient defense." (Emphasis added.) Allen Smith, 8 *Montana Revised Code,* Title 94, Chapter 47, Section 94-4073 (1947); Allen Smith, 8 *Utah Code,* Title 76, Chapter 1, Section 76-1-25 (1953); *Deering's Cal. Penal Code,* Section 656 **(1961).**

Several states have adopted the quoted language with only minor variations. See 2 *North Dakota Century Code,* Chapter 12, Section 12-05-05 (1961); West, *Oklahoma Statutes,* Title 22, Section 25 (1969); Allen Smith, *South Dakota Compiled Laws,* Title 22, Chapter 5, Section 22-5-8 (1967). Some statutes raise the bar when a "conviction or acquittal" is "within the jurisdiction of another state, territory, or country," Bobbs-Merrill, *Idaho Code,* Title 19, Section 19-315 (1948); Burns, *Indiana Stat.,* Title 9, Section 9-215 (1956); McKinney's, *Consolidated Laws of New York, Code of Criminal Proc.,* Title 1, Section 139 (1958); *Oregon Revised Statutes,* Chapter 131, Section 131.240 (1) (1968); the bar arises upon a conviction or acquittal under a statutory provision of the state or "the laws of another jurisdiction" in Wisconsin, *Wisconsin Statutes,* Section 939.74 (1967); "Under the laws of the United States, or of another state or country" in Arizona, West, *Arizona Revised Statutes,* Title 13, Section 13-146 (1956); "under the laws of [another] state or country" in Nevada, 6 *Nevada Revised Statutes,* Chapter 208, Section 208.020 (1967), and in Washington, 2 *Revised Code of Washington,* Chapter 10.43, Section 10.43.040 (1956).

Illinois has a lengthy enactment on the subject of the "Effect of Former Prosecution." The portion relevant to the *Bartkus* problem, had it been on the books when Bartkus was tried, would have provided a complete defense. The applicable portion, Smith-Hurd, *Illinois Statutes,* Chapter 38, Sections 3-4 (1964), reads:

"(c) A prosecution is barred if the defendant was formerly prosecuted in a District Court of the United States or in a sister State for an offense which is within the concurrent jurisdiction of this State, if such former prosecution:

"(1) Resulted in either a conviction or an acquittal, and the subsequent prosecution is for the same conduct, unless each prosecution requires proof of a fact not required in the other prosecution, or the offense was not consummated when the former trial began; or

"(2) Was terminated by a final order or judgment, even if entered before trial, which required a determination inconsistent with any fact necessary to a conviction in the prosecution in this State."

For an example of a federal statute prohibiting successive prosecutions in federal court following a State conviction or acquittal but **disavowing an intent to pre-empt the field, see Title 18, Section 2117,**

U. S. Code, as amended in 1966. See, also, American Law Institute, *Model Penal Code, Tentative Draft No. 5*, 1956, Section 1.11.

In a memorandum to the members of the Advisory Committee On the Federal Rules of Criminal Procedure from the United States Government, Department of Justice, dated December 23, 1963, it is stated:

"* * * the power to bring a second prosecution would * * * 'be used sparingly by the Department of Justice * * *. After a state prosecution, there should be no federal trial for the same act or acts unless the reasons are compelling' and unless approval is obtained from an Assistant Attorney General, with the consent of the Attorney General * * *."

That memorandum reflects a policy incorporated in a 1959 administrative order from the Attorney General of the United States to all United States Attorneys. See Atty. Gen. Release of May 20, 1959, cited in footnote 174, Mueller, *Criminal Law and Administration*, 35 New York Univ. Law Rev., 111, 131 (1960). For a criticism of a condition which leaves successive prosecution policy in the hands of the prosecutor, see Sigler, *Double Jeopardy*, 184-185, Cornell University Press, Ithaca, N. Y. (1969).

APPENDIX "B"

"Analysis of Precedents supporting *United States* v. *Lanza* (1920), 260 U. S. 377, 67 L. Ed. 314."

*Fox* v. *Ohio* (1847), 46 U. S. (5 How.) 410, 432-435, 12 L. Ed. 213, 223-224 (two different offenses); *United States* v. *Marigold* (1850), 50 U. S. (9 How.) 560, 565-566, 568-570, 13 L. Ed. 257, 260, 261-262 (dual sovereignty asseverations were *dicta*; sole justiciable issue was whether Congress could punish for circulation of counterfeit money); *Moore* v. *Illinois* (1852), 55 U. S. (14 How.) 13, 17, 19, 14 L. Ed. 306, 307-308 (single state prosecution approved; issue whether Illinois could pass a statute in an area in which Congress had taken action); *United States* v. *Cruikshank* (1875), 92 U. S. 542, 550-559, 23 L. Ed. 588, 590-594 (sufficiency of complaint under Civil Rights Act—violations complained of not secured by U. S. Constitution); *Ex Parte Siebold* (1897), 100 U. S. 371, 385-399, 25 L. Ed. 717, 722-727 (constitutionality of a federal statute regulating federal elections); *Cross* v. *North Carolina* (1889), 132 U. S. 131, 133, 137-140, 33 L. Ed. 287, 288, 289-290 (single prosecution; not blocked by federal statute prohibiting a different offense); *Pettibone* v. *United States* (1893), 148 U. S. 197, 202, 37 L. Ed. 419, 422 (single federal indictment for conspiracy to obstruct judicial administration in a federal court); *Crossley* v. *California* (1898), 168 U. S. 640, 641-642, 42 L. Ed. 610, at 610 (single prosecution; jurisdiction of state to prosecute for death caused by derailing a train not blocked by fact mail was exclusive cargo); *Southern Ry.* v. *Railroad Com. of Indiana* (1915), 236 U. S. 439, 444-445, 448, 59 L. Ed. 661, 665, 666 (federal conviction blocked prosecution for Indiana Safety Appliance Act violations—Congress had preempted field with Federal Safety Appliance Act); *Gilbert* v. *Minne-*

*sota* (1920), 254 U. S. 325, 326-328, 65 L. Ed. 287, at 287-288 (single prosecution under Minnesota statute which outlawed advocacy against conscription—congressional legislation covered same ground but no federal prosecution involved); *McKelvey* v. *United States* (1922), 260 U. S. 353, 356-360, 67 L. Ed. 301, 304-306 (single prosecution for obstructing passage over federal lands—only issue whether federal statute unconstitutional because encroaching on state police power) See analysis in Pontikes, *Dual Sovereignty and Double Jeopardy: A Critique of Bartkus* v. *Illinois and Abbate* v. *United States*, 14 Western Res. Law Rev. 700, 706-710 (1963). The *Lanza* opinion also asserts flatly (260 U. S. at 382, 67 L. Ed. at 317) that the Fifth Amendment "like all the other guaranties in the first eight amendments, applies only to proceedings by the Federal government." To the degree that the quoted proposition is the underpinning of *Lanza*, *Lanza* is no longer supported. See discussion in *Benton* v. *Maryland*, *supra*, under paragraph III of the opinion.