IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs on July 14, 2015

## STATE OF TENNESSEE v. ATHANASIOS DIAKOS EDMONSTON

**Appeal from the Circuit Court for Williamson County**
**No. II-CR017016    Timothy L. Easter, Judge**

---

**No. M2014-02345-CCA-R3-CD – Filed September 17, 2015**

---

The defendant, Athanasios Diakos Edmonston, appeals his Williamson County Circuit Court jury convictions of especially aggravated kidnapping, aggravated burglary, aggravated assault, and assault, contending that the trial court erred by refusing to suppress the statements he made to law enforcement officers and that the evidence adduced at trial was insufficient to support his convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Benjamin C. Signer, Franklin, Tennessee, for the appellant, Athanasios Diakos Edmonston.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Kim R. Helper, District Attorney General; and Jessica Borne, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In January 2013, the Williamson County Circuit Court grand jury charged the defendant with one count of especially aggravated kidnapping, one count of aggravated burglary, and two counts of aggravated assault. The trial court conducted a jury trial in July 2014.

The State's proof at trial showed that the victim and the defendant dated sporadically from 2008 until early November of 2012. In mid-November 2012, the victim began dating someone else. On or around November 18, the victim changed her

cellular telephone number because the defendant "would not stop calling and texting" her. On November 19, the victim contacted the Franklin Police Department ("FPD") to report that the defendant had called the Walgreen's where she was employed between 13 and 15 times that day. The defendant resumed calling the victim at the Walgreen's on November 21, prompting her to once again contact the police. FPD Officer Joe LeCates went to the Walgreen's and called the defendant. Before leaving the store, Officer LeCates instructed the victim to call the police if the defendant contacted her again. Approximately 15 minutes later, the defendant called the victim, telling her that she was "a b****" and informing her that if she "thought the officer was going to scare him, then [she] was wrong." The victim tried unsuccessfully to reach Officer LeCates to report the call, and when she arrived at home that evening, she sent the following electronic mail message to Officer LeCates:

> I talked with you today at my work at Walgreens in Cool Springs. My ex called me at least five more times after you told him not to contact me. I wish to pursue the right legal actions. He has threatened my well being twice today. Thank you for your help, . . . .

The victim did not hear back from Officer LeCates. Because of the Thanksgiving holiday, she was not scheduled to return to work until Tuesday, November 27.

On November 25, the victim's new boyfriend went to her house to decorate the family Christmas tree and watch a movie with the victim and her parents. Later that evening, the victim's parents retired to their bedroom on the second floor of the house, and the victim's boyfriend left shortly after midnight. The victim then retreated to her own bedroom on the third floor of the residence and went to sleep. At approximately 2:00 a.m. on November 26, the victim was awakened by the sound of her bedroom door closing. Initially, the victim could only see "a dark figure standing there." The dark figure then turned on the bathroom light, and the victim realized that the person was the defendant. The victim saw that the defendant was wearing gloves and that he had a gun holstered on one hip and a knife sheathed on the other hip.

The victim immediately felt "threatened that he was in there," but the "gun and the knife just added the double amount of fear." She asked why he was there, and the defendant responded that he "just wanted to talk." The defendant told the victim that if she "made a sound when [they] were leaving to wake up [her] parents, that he would kill them." The defendant took the handgun out of its holster and showed the gun to her. While the defendant was talking to the victim, he said something that caused her to slap him across the face. The defendant responded by punching the victim in the mouth, paritally knocking out one of her teeth and causing her to black out.

When the victim regained consciousness, the defendant led her through the basement and into his mother's vehicle, which was parked outside. The victim was wearing only shorts and a t-shirt; she had neither shoes nor a jacket. The defendant continued to insist that he "wanted to talk" to the victim, but he never told her where they were going. The defendant eventually drove onto Interstate 40 heading west, and the victim fell asleep.

When she awoke around dawn, the victim realized that they were near Greenfield, Tennessee, which is where the victim had attended her senior year of high school. The defendant drove the victim to his family's house in Sharon, Tennessee, and, once inside the residence, he instructed the victim to lie down on the sofa. A few minutes later, the defendant's mother walked into the living room. The defendant told his mother that the victim was there willingly, so the defendant's mother returned to her bedroom. The defendant then punched the victim in the side of her face, causing the victim to scream. The defendant's mother then reentered the living room, but the defendant told her that the victim was "upset about something" and asked his mother to return to her bedroom. The defendant then punched the victim in the face again, prompting the defendant's mother to return to the living room. At that point, the victim told the defendant's mother what had happened. The defendant demanded that the victim log into her Facebook account and break up with her boyfriend, but the victim refused, causing the defendant to punch her in the side of the head. Throughout the victim's time in the defendant's house, the defendant delivered multiple blows to her head, causing her to black out repeatedly.

At some point, the defendant's sister, Pannayiotta Edmonston, arrived at the house. She immediately checked on the victim's well-being and sat with her on the sofa. The defendant's father arrived a short time later. None of the defendant's relatives called 9-1-1, but, according to the victim, "everybody was trying to figure out how to get [her] out of the house, but the defendant would not let [her] leave." Eventually, Ms. Edmonston and her father restrained the defendant to give the victim time to run to Ms. Edmonston's vehicle outside. The victim got inside the front passenger seat of the vehicle and locked the doors. The defendant came outside and used a tire iron to break the window by the victim's seat. He repeatedly punched the victim in the head, breaking her nose. An ambulance arrived a short time later and transported the victim to the hospital.

Jerry Wilson, Chief of Police of the City of Sharon, was the first to arrive on the scene. Chief Wilson asked the defendant what had happened, and the defendant responded that he had hit the victim. Chief Wilson then arrested the defendant. Both

Chief Wilson and fellow Officer John Groban provided the defendant with *Miranda*[1] warnings. Officers later recovered both the defendant's handgun and military-style knife.

Detective James Colvin with the Brentwood Police Department spoke with the victim at her family's home in the early morning hours of November 27. Detective Colvin discovered "tool marks or pry marks" on the strike plate and locking mechanism of a "pedestrian door" located next to the residence's garage doors and determined that to be the defendant's point of entry into the family's home. On November 28, Detective Colvin traveled to the Weakley County jail where the defendant was housed and interviewed the defendant. An audio recording of the interview was admitted into evidence and played for the jury.

After Detective Colvin provided the defendant with *Miranda* warnings, the defendant agreed to speak with the detective. The defendant admitted to breaking into the victim's house, to taking his gun into the victim's bedroom, and to hitting the victim, but he denied that the victim accompanied him to Sharon against her will.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, the defendant chose to testify and present proof.

Ms. Edmonston testified that she is the defendant's older sister. She stated that she arrived at her family's residence on the afternoon of November 26 and encountered the victim asleep on the living room sofa. Ms. Edmonston denied that the victim asked for help or complained of pain or any injuries. Ms. Edmonston left the house to purchase some food, and when she returned, the defendant and the victim were arguing. Ms. Edmonston offered to take the victim home. After the victim got into the passenger seat of Ms. Edmonston's car, the defendant broke the passenger side window and began punching the victim.

The defendant testified that he "showed up" at the victim's residence on November 26 because he "wanted to talk" to the victim. The defendant stated that after they talked "for a little bit" they "came to a mutual decision" to leave. The defendant convinced the victim to return to west Tennessee with him for the night. When they arrived at his mother's residence, they "[t]ook a nap," "[w]oke up," and "[g]ot in an argument." The defendant denied kidnapping the victim or displaying a weapon. The defendant testified that his trial testimony differed from the statement he gave Detective Colvin because he was "scared and kind of nervous" and because the officers had "threatened [him] if [he didn't] cooperate."

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Based on this evidence, the jury convicted the defendant as charged of especially aggravated kidnapping, aggravated burglary, and aggravated assault. In addition, the jury convicted the defendant of assault. Following a sentencing hearing, the trial court sentenced the defendant as a standard offender to a term of 24 years' incarceration to be served at 100 percent by operation of law for the especially aggravated kidnapping conviction and 5 years' and 3 years' incarceration to be served at 30 percent for the respective convictions of aggravated burglary and aggravated assault. With respect to the simple assault conviction, the trial court imposed a sentence of 11 months and 29 days. The court ordered all sentences to be served concurrently for a total effective sentence of 24 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by refusing to suppress the incriminating statements he made to law enforcement officers and that the evidence adduced at trial was insufficient to support his convictions of especially aggravated kidnapping and aggravated assault. We will consider each claim in turn.

*I. Motion to Suppress*

The defendant first contends that the trial court erred by denying his motion to suppress the inculpatory statements he provided to law enforcement officers, claiming that the statements were obtained in violation of his constitutional rights. Specifically, the defendant claims that his confession was coerced and therefore should have been suppressed. The State asserts that the trial court did not err by denying the motion and admitting the statements as evidence at trial.

At the hearing on the defendant's motion to suppress his pretrial statement, Detective Colvin testified that he advised the defendant of his *Miranda* warnings and that the defendant signed a waiver of his rights. Detective Colvin recalled that the defendant had received his general educational development ("GED") diploma and that he had previously been a member of the Army National Guard. Detective Colvin estimated that the interview lasted approximately two hours, and he denied threatening or making any promises to the defendant in exchange for his admission of guilt. Detective Colvin acknowledged that the defendant evinced some reluctance to speak with him, but he confirmed that the defendant never asked to speak with an attorney and never indicated that he wished to stop speaking with Detective Colvin.

The trial court denied the defendant's motion to suppress, finding that the defendant unquestionably "signed a waiver of his [*Miranda*] rights and agreed to speak

with Detective Colvin," that nothing indicated "that the waiver was invalid or that the defendant was forced to sign the waiver," and that "[t]he waiver was signed by the defendant voluntarily and was not a product of coercion or threats." The trial court remarked further:

> Statements made by the defendant to Detective Colvin were not coerced. There is nothing in the record to indicate that the statements made by the defendant are untrustworthy. The statements made by the defendant to Detective Colvin were made freely and voluntarily. The statements were not extracted by threats, violence or by direct or implied promises. The Court considered the following factors to determine the voluntariness to the defendant[']s statements: defendant was 22 years of age when the statements were given; defendant had previously been arrested and read his [*Miranda*] rights; defendant has a GED and was a member of the United States Army; defendant[']s statement was taken without undue delay; defendant was not injured, intoxicated or deprived of food or sleep; defendant appeared to be in good health; defendant[']s statements were not given as a result of threats and/or physical abuse. This [c]ourt . . . does not find any evidence to support the notion that the defendant's will was so overborne by deceptive, illegal or improper tactics by Detective Colvin so as to render the defendant's statements involuntary. This [c]ourt finds no evidence that the tactics by Detective Colvin violated any law in any manner.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth

Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment).  This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted).  The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991).  To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."  Tenn. Const. art. I, § 9.  "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005).  "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[2]

Upon our review, we conclude that the record does not support the defendant's claim that his statement was involuntarily given or was the result of police coercion.  The 22-year-old defendant, who possessed a GED diploma and had served in the United States military, was provided with *Miranda* warnings and signed a waiver of his rights.  The defendant suffered from no injury, illness, or intoxication during his interview, and he was not abused or deprived of food or sleep during the interview.  Although Detective Colvin repeatedly encouraged the defendant to talk to him, he

---

[2] This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

explicitly told the defendant, "I haven't made you any promises, and I'm not going to make you any promises. I don't know how this is going to play out for you in court." Nothing indicates that any of the detective's statements could be considered coercive or promises of leniency.

The trial court did not err by denying the defendant's motion to suppress his statements.

## II. Sufficiency

The defendant contends that the evidence is insufficient to support his convictions of especially aggravated kidnapping and aggravated assault. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[e]specially aggravated kidnapping is false imprisonment, as defined in § 39-13-302: . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id.* § 39-13-305(a)(1). Aggravated assault, as charged in the indictment, is an intentional or knowing "assault as defined in § 39-13-101(a)(1)" that is committed via the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(B). Assault, as is relevant to this case, occurs when one "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2).

In the instant case, the proof at trial established that the defendant, after

- 8 -

breaking into the victim's home, entered the victim's bedroom in the middle of the night armed with a handgun and a knife. The defendant removed the gun from its holster and showed it to the victim. The defendant then punched the victim in the mouth, fracturing her tooth and causing her to black out. After threatening to kill her parents if she made any noise, the victim left the house with the armed defendant, clad only in shorts and a t-shirt in late November. The defendant then drove the victim a few hours away to Sharon, Tennessee. Without question, the evidence sufficiently established that the defendant committed both the offense of especially aggravated kidnapping and the offense of aggravated assault by the display of a handgun, a deadly weapon. Although not raised by the defendant on appeal, we hold the evidence likewise supports the defendant's convictions of aggravated burglary and assault.

*Conclusion*

The trial court properly denied the defendant's motion to suppress his statement to law enforcement officers, and the evidence is sufficient to support the defendant's convictions. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE